# THE TONAWANDA RAIL-ROAD CO. *vs.* MUNGER.

Every unwarrantable entry by a person or his cattle on the land of another, is a trespass.

This is so at common law, though the entry be by cattle coming from the highway, and the land be unfenced; and it is no excuse that the owner exercised care and prudence to keep them in his own inclosure.

The purpose of fences, in the view of the common law, is to keep the owner's cattle *in*; and not the cattle of others *out.* *Per* BEARDSLEY, C. J.

But if cattle driven along a highway, escape into an adjoining field, against the owner's will, the rule does not apply, and the trespass is excused. And so of other cases of unavoidable necessity. *Per* BEARDSLEY, C. J.

Where a proprietor of land is bound by prescription to fence against cattle lawfully in the highway, he cannot maintain trespass for an entry of cattle arising out of a defect in his fences. *Per* BEARDSLEY, C. J.

The provisions of the revised statutes authorizing towns to prescribe what shall be a sufficient fence, and to determine when cattle may run at large on the highways; and that which forbids a recovery for a trespass by cattle lawfully in a highway, by one whose fences do not conform to the town regulation, do not apply to lands owned by a rail-road corporation and used as a rail-road track.

And inasmuch as these statutes authorize the appropriation, to the use of any one having cattle whom he may choose to have run at large, without a provision for compensation, of the grass and herbage growing on the track of highways which, subject to the public right of way, are the property of private proprietors; such statutes are to that extent unconstitutional and void. *Per* BEARDSLEY, C. J.

Accordingly *held* that where cattle enter from a highway, where it crosses a rail-road, on to the track of such rail-road, such entry is a trespass, although there is no obstacle to prevent such entry, and the town has made regulations requiring fences of a particular kind, and allowing cattle to run at large on the highways.

Cattle escaping from the owner's enclosure, into a highway, against his will, are not "lawfully going at large," within the meaning of the statute, though there be a town regulation authorizing cattle to run at large. *Per* BEARDSLEY, C. J.

An action for negligence cannot be sustained if the wrongful act of the plaintiff co-operated with the misconduct of the defendant to produce the damages sustained.

This is so whether the plaintiff's act be negligent or wilful.

Therefore, where domestic animals stray upon land where they have not a right to be, and are injured by the negligence of the owner of the land, an action will not lie by the owner of the beasts against the owner of the land.

Otherwise, where the act by which the injury is effected is criminal, or is calculated to endanger human life.

Accordingly *held* that a rail-road company is not liable for negligently running

an engine upon and killing the cattle of the plaintiff, which had come from the highway, upon the track of the rail-road, though there was no physical obstacle to prevent their entry.

ERROR to the Monroe common pleas. Munger sued the plaintiffs in error in the court below in *case,* for the negligence of the defendants in that suit in running their steam engine and cars, by means of which two oxen, the property of the plaintiff, were run over and killed. Plea, not guilty.

At the trial in December, 1844, the plaintiff proved that the defendants' rail-road passed through the farm of the plaintiff in the town of Gates, and that a highway crossed the rail-road at that place ; that on the 4th day of August, 1843, at about midnight, the engine attached to a train of cars ran upon two oxen of the plaintiff and killed them, the engine being thrown off the track by the obstruction ; that the cars were going east at the rate of from 7 to 9 miles an hour, that the night was dark and misty, and there was no moon, and though there was a lamp on the forepart of the engine, the plaintiff's witness said it was dim, and he thought the oil was not good. The plaintiff also proved that at 8 o'clock in the evening preceding the accident, the oxen were in his own pasture, which was enclosed by a good fence ; that in the morning the fence was down, three or four rails being thrown off; that after getting out of the pasture the cattle could go directly upon the highway, on to the track of the rail-road, and then there was nothing to prevent their passing along the track, there being no cattle guards or other obstruction ; and that the road crossed a short distance above the place where the accident happened. One of the plaintiffs' witnesses said he could see 25 rods ahead of the engine on the track of the road by the light, and that the train could be stopped in running the distance of 50 feet, though running at the rate of ten or twelve miles an hour.

The plaintiff gave in evidence the town regulations of the town of Gates, passed in 1835. By them it was declared that cattle might " run at large," and that all fences in such town should be 4½ feet high and well filled in, and that all persons in said town should fence their lands by such fence.

The Tonawanda Rail-Road Co. *v.* Munger.

On the part of the defendant it was shown that the spot where the accident happened was about eight rods east of the road crossing, that the engineer could not see more than five or six rods ahead, that the lamp and oil were good and in good order; that the oxen were lying on the track, and that as soon as they were seen, which was as early as it was possible to see them, the safety valve was raised to frighten them, the engine was reversed and the brake was applied, and every thing practicable was done to stop the train, but it ran upon them; that the usual speed was fourteen or fifteen miles an hour, but they were then running at about eight miles— and that the train could not be stopped short of about ten rods from the time of making the attempt.

The court charged the jury that if the defendants' business was of a kind which was dangerous to the lives or property of others, they were bound to use the utmost caution; but it was left to the jury to say whether the business was of that character, and whether proper caution was used. It was declared that the plaintiff must be free from negligence, but if his cattle got out of his lot without carelessness or negligence on his part and went upon the rail-road and were ran over by the negligence of the defendants, they were liable; that the town regulations passed in 1835 still continued in force, and that the plaintiff's cattle were not trespassers by being on the rail-road; but that independent of these regulations all that could be required of the plaintiff was the exercise of ordinary care and prudence in taking care of his cattle. The defendants' counsel asked the court to charge that the town regulation which had been proved referred only to public highways, and was not applicable to the rail-road. The court refused to charge in that manner; and in conclusion advised the jury that they were to judge whether, under all the circumstances, eight or nine miles an hour was too fast to run the cars, and that the question whether there was negligence or not was submitted to them. The defendants' counsel excepted to each distinct branch of the charge. The defendants brought error on a bill of exceptions.

VOL. V.*　　　　33

The Tonawanda Rail-Road Co. *v.* Munger.

*A. Sampson,* for the plaintiffs in error. 1. The judge erred in charging the jury that the plaintiff's oxen were not trespassers on the rail-road. Neither the town law, or the statute under which it was passed, had any reference to a rail-road It only contemplated common highways as those on which cattle might run at large. (1 *R. S.* 341, § 5, *sub.* 11.) But as to highways the act is not warranted by the constitution, for the public have but an easement in the land while the owner retains all other rights, subject to the right of passage; and authorizing it to be depastured by every one, is an appropriation of private property for what is not a public use and without any compensation. (*Taylor* v. *Porter,* 4 *Hill,* 140.) 2. The court erred in deciding that the defendants were bound to use the greatest degree of caution. 3. The instruction that if the plaintiff exercised ordinary care and prudence in taking care of his cattle, it was enough. The question was whether they were lawfully on the rail-road. If they had no right to be there the means which the plaintiff had taken to keep them off were of no importance. (*Bush* v. *Brainard,* 1 *Cowen,* 78.) It was erroneous to submit to the jury the question whether there could be negligence in running rail-road cars at half speed.

*W. J. Bacon,* for the defendant in error, insisted that the cattle were lawfully running at large. When *Bush* v. *Brainard* was decided, there was no statute giving effect to town regulations as to cattle running at large, but the revised statutes conferred plenary powers on the towns on that subject; (1 *R. S.* 341, § 5;) and the town of Gates has determined that cattle may run at large on the highways in that town. The rail-road was not fenced or otherwise protected against cattle coming upon it from the highway. Again, the plaintiff was not in fault. His field in which the oxen were kept was sufficiently fenced, and if the cattle were improperly on the rail-road no negligence can be imputed to him. The charge was correct as to the degree of care to which the defendants ought to be held. The great force and rapidity of a rail-road train, and the imminent danger of destructive or fatal consequences, should require from

The Tonawanda Rail-Road Co. *v.* Munger.

those who use them for profit the greatest possible measure of caution.

*By the Court,* BEARDSLEY, C. J.   These oxen, when killed, were on the defendant's land.   They had broken from the plaintiff's field into the highway, along which they wandered to the rail-road, where, leaving the highway, they passed on the rail-road to the place where the accident occurred.

Every unwarrantable entry by a person or his cattle, on the land of another, is a trespass, and that whether the land be enclosed or not.   ( *Wells* v. *Howell,* 19 *John.* 385 ; 1 *Ch. Pl. ed.* 1837, *p.* 94, 5 ; *Browne on Actions at Law,* 369.)   It is a general rule of the common law that the owner of cattle is bound, at his peril, to keep them off the land of other persons, and he can not justify or excuse such an entry by showing that the land was unfenced.   Fences were designed to keep one's own cattle at home, and not to guard against the intrusion of those belonging to other people.   ( *Gale & Whatlay's Law of Easements,* 297 ; *Rust* v. *Low,* 6 *Mass.* 94 ; *Dyer,* 372, *pl.* 10 ; 1 *Cowen,* 79, *note.*)   There may be exceptions to the rule stated, growing out of a necessity, all but irresistible, in particular exigencies, as where cattle driven along a highway, stray from it in sight of the person in charge of them, and pass, against his will, onto unenclosed land adjoining the highway, he making fresh suit to bring them back ; for in such case the owner ought not to be chargeable for this involuntary trespass on the land, nor for the herbage the cattle may crop, *raptim et sparsim,* as they go along.   (1 *Cowen,* 87, *note ; Com. Dig. Trespass D.; Stackpole* v. *Healy,* 16 *Mass.* 35 ; 1 *Arch. N. P.* 358 ; *Fitz. N. B.* 298, *note.*)   But there is no occasion to dwell upon this, or any other common law exception to the rule, for none of them afford any legal justification or excuse, for the entry of these oxen upon the land of the defendants.   Nor indeed, was it suggested on the argument, that by the common law, this entry was any thing short of a trespass, although it was urged not to be so under the revised statutes.

By the statute, (1 *R. S.* 353, *art.* 4,) it may be made the

duty of owners of adjoining lands to build and maintain certain parts of the division fences. The like obligation may also be imposed by contract, or prescription which presupposes an original contract; and, where the duty exists and has been violated, the law will give no redress to the party in fault for damages sustained by him in consequence of a defect in that part of the fence he was bound to make or repair. (1 *Ch. Pl* 544; 2 *Saund.* 285, *n.* 4; 1 *Cowen,* 79, *note; Shepherd* v. *Hecs,* 12 *John.* 433.) An act passed in 1838, (*Laws of* 1838, *p.* 253,) declares that " if any person liable to contribute to the erection or reparation of a division fence, shall neglect or refuse to make and maintain his proportion of such fence, or shall permit the same to be out of repair, *he shall not be allowed to have and maintain any action for damages incurred.*" This created no new rule, but merely affirmed a well settled principle of the common law, forbidding a recovery in any case for damages which the negligence or positive misfeasance of the party complaining contributed to bring upon himself. We shall have occasion further to advert to this principle; but at present it may be observed that no question as to division fences is involved in this case, for these oxen escaped directly from the plaintiff's field into the highway, and from which they passed onto the land of the defendants.

Where a prescriptive obligation rests on the owner of land adjoining a highway, to fence against cattle lawfully therein, he cannot maintain trespass for an entry by such cattle through a defect in his fence. This is well settled. But it is not pretended any such prescriptive duty rested on these defendants. On the argument the case was placed on the ground that the statute required them to fence against cattle running at large in the highway, and that is the precise point to be considered.

A section of the revised statutes declares that " the electors of each town shall have power at their annual town meeting," to made " rules and regulations for ascertaining the sufficiency of all fences in such town; for determining the times and manner in which cattle, horses or sheep, shall be permitted to go at large on highways; and for impounding animals." (1 *R. S.* 341, §5, *sub.* 11.) And by a subsequent section, (*p.* 355, §44,

The Tonawanda Rail-Road Co. *v.* Munger.

" whenever the electors of any town shall have made any rule or regulation, prescribing what shall be deemed a sufficient fence in such town, any person who shall thereafter neglect to keep a fence according to such rule or regulation, shall be precluded from recovering compensation in any manner, for damages done by any beast, lawfully going at large on the highways, that may enter on any lands of such person, not fenced in conformity to the said rule or regulation, or for entering through any defective fence."

The last section of the statute, it will be noticed, applies only where the town has prescribed, "*what shall be deemed a sufficient fence,*" and where the beasts were "*lawfully going at large on the highways.*"

In 1835, the town of Gates, where these oxen were killed, made regulations, declaring that cattle might "*run at large,*" and "that all fences in said town, should be four feet and a half high and well filled in, and that all persons in said town should fence their lands by such fence."

Now let it be conceded that these regulations were in as full force when this casualty occurred in 1843, as when made in 1835, I still do not see that they can at all aid the plaintiff. In the first place, that part of them requiring lands to be fenced, is wholly inapplicable to such land as is used for the track of a rail-road where it intersects a highway. In terms, the regulations declare that all lands shall be fenced by fences four and a half feet high, and well filled in, a provision which we cannot suppose was ever designed to have any application to the site of a rail-road where it crosses a highway. It would be absurd to require fences to be made at such places, and the mere *general terms* of a town regulation should receive a more rational interpretation. To avoid giving a grossly absurd meaning to a statute or regulation, we should not only look at all its words, but, if need be, should understand them in their most rigorous sense. Looking at this regulation then, we shall see that, literally, none but "*persons in said town*" are required thus to fence their lands. The word "*persons*" doubtless may, and in some cases should, be understood to embrace corpora-

tions, which are legal persons, but as here used, it can have no such meaning; the persons referred to in the regulation must be "*in said town*," words which, in no just sense, can be applied to this rail-road corporation.

But of themselves, town regulations, however explicit, can have no effect upon the particular question now under consideration. If violated, they would neither justify or excuse an entry on the track of a rail-road, nor could they deprive its owners of the right to maintain an action of trespass for the entry. Town regulations have, for these purposes, no intrinsic vigor or authority, and are only made efficient by the *forty-fourth* section of the statute which has already been set forth at large. That section precludes a recovery, by any person who shall neglect to keep a fence according to the rule prescribed by the town, for damages done by beasts "lawfully going at large on the highways, that may enter on any lands of such person, not fenced in conformity to the said rule."

This section, in its terms and spirit, seems applicable to such lands only as are usually fenced, or which are capable of being used in that condition. But this cannot be done with the track of a rail-way. No one ever supposed that such a strip of land should be surrounded in its whole extent, by a fence, or that a fence could be maintained across a rail-way at every intersection of a highway. It is not too much to say that this would be wholly impracticable without entirely defeating the great object, accelerated speed, for which rail-roads are allowed to be constructed. The general terms of a statute, declaring what consequences shall follow a refusal or neglect to fence land, in conformity with town regulations, especially a statute, passed, as the *section in question* was, years before a rail-road had been made on this continent, cannot reasonably be understood to have any application to land occupied as the track of such a road. If the legislature had intended to confer on the several towns, through which rail-roads might be constructed, the requisite power to compel the owners of such roads, to guard against the entry of cattle thereon, from the highway, we have a right to believe that the power would have been given in very

The Tonawanda Rail-Road Co. *v.* Munger.

explicit and unambiguous terms; and that no town, in the exercise of such a power, would have made regulations at all like those in evidence in this case. A fence four feet and a half high, is by no means adapted to the object, although a ditch, impassable by cattle, may readily be cut on each side of a highway where intersected by a rail-road, and which would in no degree interfere with the movement of a rail-road train. Something like this, which would be an effectual guard against cattle at such places, would seem to be but reasonable as between the owners of rail-roads and the owners of cattle passing upon, or casually at large in the highway, while it is imperiously demanded with a view to the safety of passengers and property on the rail-road trains. This, however, is foreign to the case in hand. The legislature have not yet authorized towns to require that ditches shall be cut, nor did the town of Gates assume to exercise any such power. The regulation called for fences, not ditches; and neither that, or the section of the statute to which reference has been made, can be held applicable to land at a rail-road crossing. Obviously, neither was designed for land used as the track of a rail-road. These town regulations and the statute cannot, therefore, excuse the entry of these oxen upon the land of the defendants, nor are they thereby precluded from recovering their damages for this entry. There was nothing to change the rule of the common law which requires the owner of cattle to keep them off the land of all other persons. The entry was made without authority or excuse, and was consequently a trespass on the defendants.

There is another view of this part of the case, leading to the same result. If these oxen were not "lawfully going at large on the highways," (§ 44, *supra*,) their entry on the defendants' land could not be excused by the want, or defect of fences. The oxen were not in the highway for the ordinary purpose of travel in passing from one place to another, but having broken out of the plaintiff's field, were literally "*at large*," for grazing rest or mischief, as their wants or instincts might prompt. This, in my judgment, was far enough from "lawfully going at large" in a highway, notwithstanding the legislature have

declared that towns may determine the times and manner in which cattle, horses and sheep shall be permitted to go at large. (§ 5, *sub.* 11, *supra.*)

The public interest in a highway comprehends the right of every individual to pass and repass upon it, in person and with his property, at his own pleasure; but confers no right to use it as a sheep walk or pasture ground for cattle. Subject to this right of passage and the right to make repairs and the like, the soil of a highway and the grass and herbage growing thereon, are still, in the strictest sense, private property. (1 *Cowen,* 88, note; 2 *Smith's Lead. Ca. Phil. ed.* 94, 99, notes; 3 *Kent,* 432, 434.) Cattle, at large in the highway, will not only trample down but also crop and eat the grass and herbage there growing; and if the legislature have power to authorize their running at large, the grazing cannot be wrongful. What would this be but taking the private property of the owner of the land used as a highway, and transferring it to the owner of the cattle? In my judgment the legislature have no such power, whether compensation be made or not, but certainly in no case, unless compensation is made. On this short ground, I think the town regulation assuming to authorize cattle to "*run at large,*" was wholly void. But it is not my purpose further to discuss the question, and I will only refer to cases and books which, in my view, fully sustain what I have stated. (*Stackpole* v. *Healy, supra; Holladay* v. *Marsh,* 3 *Wend.* 142; 1 *Cowen,* 88, note; *Taylor* v. *Porter,* 4 *Hill,* 140.) On this second ground therefore, as well as on that first stated, my conclusion is that these oxen, when killed, were trespassing on the defendants' land.

The present action is founded on the alleged negligence of the agents and servants of the defendants, in running their engine on the rail-way, whereby, as is charged, the plaintiff's oxen were killed. It is not pretended the act was done, designedly, by the persons in charge, but simply that it occurred through their negligence and want of care.

It is a well settled rule of law, that such an action cannot be sustained if the wrongful act of the plaintiff co-operated with

the misconduct of the defendants or their servants to produce the damage sustained. I do not mean that the co-operating act of the plaintiff must be wrong in intention, to call for the application of this principle, for such is not the law. The act may have been one of mere negligence on his part, still he can not recover. Or his beast, while trespassing on the land of another person, and that without the consent or knowledge of its owner, may have been damnified through some careless act of the owner of the land, yet the fact of such trespass constitutes a decisive obstacle to any recovery of damages for such an injury. It is, strictly speaking, *damnum absque injuria.*

The case of *Blyth* v. *Topham,* (*Cro. Jac.* 158,) was an action for digging a pit in a common, by occasion whereof the plaintiff's mare, *straying there,* fell into the pit and was killed. It was held by the whole court that the action would not lie ; the plaintiff had no right in the common, and so, as against him, the digging of the pit was lawful. Precisely so in the present case ; the plaintiff shows no right to have his oxen on the track of this rail-road, for they were there straying ;—he therefore cannot set up that the engine was unfit for use or was run in a negligent manner.

*Bush* v. *Brainard,* (1 *Cowen,* 78,) was in principle like that of *Blyth* v. *Topham.* Some maple syrup had been left by the defendant in buckets in an open shed on his own unenclosed wood land. The plaintiff's cow came in the night and drank the syrup, which caused her death. It was agreed by the court " that, although the defendant was guilty of gross negligence,"—" the plaintiff, having no right to permit his cattle to go at large" on the defendant's land, could not recover.

Numerous other cases have been determined on the same principle. *Sarck* v. *Blackburn,* (4 *C. & P.* 297,) was an action brought to recover damages for an injury by the bite of a vicious dog kept by the defendant. The dog was chained in a yard in the rear of the defendant's house, near one of the passages leading to it, and through which the plaintiff was walking when the dog fell upon him. Chief Justice Tindal, in his charge to the jury said, " the question will turn upon

whether there was a justifiable right to be on the spot." "If a man puts a dog in a garden walled all around, and a wrong-doer goes into the garden, and is bitten, he cannot complain in a court of justice of that which was brought upon him by his own act." And in an action for an injury done by a vicious bull, Chief Justice Best was not less explicit. "If the plaintiff," said he, "had gone where he had no right to go, that might have been an answer to the action; but the fact was not so. The plaintiff had a right to be where he was—he was in the pursuit of his ordinary business." (*Blackman* v. *Simmons*, 4 *C. & P.* 138.) See also *Brock* v. *Copeland*, ( 1 *Esp.* 203 ;) *Howland* v. *Vincent*, (10 *Metcalf*, 371 ;) and *Jordin* v. *Crump*, (8 *M. & W.* 782.)

Where that which is done by a party on his own land is illegal and punishable as such; or, although not illegal, if it be an act which probably may endanger human life, as the setting of spring guns, he may be responsible even to a voluntary trespasser for injuries thus sustained. (*Bird* v. *Holbrook*, 4 *Bing.* 628; *Jordin* v. *Crump*, *supra*.) But even in such a case, where the plaintiff had notice that deadly engines were placed in a wood, into which he, notwithstanding, entered and was severely wounded, it was held he could not maintain any action, having voluntarily brought the injury upon himself. (*Ilott* v. *Wilkes*, 3 *B. & Ald.* 304.)

One who complains of another's negligence should, himself, be without fault. (*Brownell* v. *Flagler*, 5 *Hill*, 282 ; *Cook* v. *The Champ. Trans. Co.* 1 *Denio*, 99.) Where the plaintiff, at the time of the alleged injury, was trespassing on the defendant, or otherwise wrong in the particular act complained of, such delinquency alone, with very limited exceptions, is a decisive answer to any claim for damages founded on the defendant's negligence.

Negligence is a violation of the obligation which enjoins care and caution in what we do. But this duty is relative, and where it has no existence between particular parties, there can be no such thing as negligence in the legal sense of the term A man is under no obligation to be cautious and circumspect

The Tonawanda Rail-Road Co. *v.* Munger.

towards a wrongdoer. A horse straying in a field falls into a pit left open and unguarded; the owner of the animal cannot complain, for as to all trespassers the owner of the field had a right to leave the pit as he pleased, and they cannot impute negligence to him. But injuries inflicted by design are not thus to be excused. A wrongdoer is not necessarily an outlaw, but may justly complain of wanton and malicious mischief. Negligence, however, even when gross, is but an omission of duty. It is not designed and intentional mischief, although it may be cogent evidence of such an act. (*Story on Bl.* §§ 19, 22; *Gardner* v. *Heartt,* 3 *Denio,* 236.) Of the latter, a trespasser may complain, although he cannot be allowed to do so in regard to the former.

In the present case the charge of the court was in several material respects erroneous.

As to passengers on this rail-road, the defendants were certainly bound by the highest obligations of morality and law, to run their engines and trains, with the most scrupulous care and vigilance. It was also their duty to use every precaution to guard against communicating fire, to buildings or other property, adjacent to the line of their road, or otherwise doing injury thereto. But they owed no such duty to this plaintiff in regard to his oxen when trespassing on their land. The suggestions of the court below, on this part of the case, would be very appropriate to a case between a passenger who had been injured through the negligence of an engineer, or the conductor of a train, but had no proper bearing on the case then to be decided by the jury.

The court seem to have held that if the plaintiff's oxen escaped from his enclosure after the exercise of " ordinary care and prudence in taking care of" them, he was not responsible for their trespass on the defendants' land. This view of the law, we think, cannot be sustained. The plaintiff was bound at his peril to keep his cattle at home, or at all events to keep them out of the defendants' close, and no degree of " care and prudence," if the cattle found their way onto the defendants' land, would excuse the trespass. It would be a new feature in the

law of trespass, if the owner of cattle could escape responsibility for their trespasses by showing he had used "ordinary," or even extraordinary "care and prudence" to keep them from doing mischief.

There was manifest error in charging that the town regulation, allowing cattle "to run at large," applied to rail-roads as well as highways, so that these oxen were not trespassing on the defendant's land. Rail-roads, although designed to subserve the public interest and convenience, are still not highways, but in strictness mere private property, and no town has any right to authorize cattle to enter on them.

The jury were told they might determine for themselves, and consequently decide the case on the point, whether running the cars at the rate of eight or nine miles an hour, was not, of itself, an act of culpable negligence. If it had appeared that the road was ruinous, or the engine or cars unfit for use, it would have been right, where the plaintiff was at liberty to complain of a want of care, for the jury to say whether eight or nine miles an hour was not, under such circumstances, evidence of gross negligence. But where the railway, engines and cars are in good condition, it would indeed be remarkable, if a rate of speed, not beyond half the usual rate on the railways in the state, could be deemed such evidence as would authorize a jury to find the fact of negligence. Upon such a state of facts as I have supposed, the point should not be left to a jury, for the naked fact that the rate of speed was eight or nine miles an hour, would be wholly insufficient to authorize a verdict finding negligence on the part of the owners of the railway.

I am strongly inclined to the opinion that further legislation would be proper to guard against the entry of cattle on land used for the tracks of railways. The loss of property in this manner is of no trivial consequence; but the personal injuries thus inflicted, and the occasional loss of human life, demand that every practicable effort should be made to avert such deplorable consequences.

White *v.* Platt.

The judgment below should be reversed, and a *venire da novo* awarded.

WHITTLESEY, J., being a stockholder in the rail-road com pany, took no part in this cause.

Judgment reversed.