## Case No. 1,713.

### BOWAS v. PIONEER TOW LINE.

[2 Sawy. 21.] [1]

District Court, D. California. May 17, 1871.

TOWAGE — NEGLIGENCE IN TOWING — LIABILITY— MEASURE OF DAMAGES — PARTNERSHIP — WHAT CONSTITUTES BETWEEN OWNERS OF TUG AND BARGE.

1. A tug towing a barge approached a wharf where the latter was to land, but failed to make

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

fast her lines by reason of their slipping and parting. The barge was driven by the tide against the wheel of a stern-wheel steamer lying at an adjacent wharf, thereby causing the wheel to revolve, and to inflict serious injuries on the libellant, who was at work in the wheel. *Held*: 1st, that the barge was in fault in not properly providing and handling the lines upon which she relied to stop her headway; 2d, that the tug was in fault in casting off the barge before she was properly secured, or in not affording her timely aid, or in removing to so great a distance that it was impracticable to do so; 3d, that the libellant was not bound to lash the wheel of the steamer in such manner as to prevent all injurious consequences of the negligence of others; it was sufficient if the lashings were strong enough to resist the action of the tide or waves, the swell of a passing vessel, or any other force which might reasonably be anticipated; 4th, even if the lashings were not so strong as prudence required, the immediate cause of the accident was the negligence of the respondent, and the rules relating to contributory negligence do not apply.

[Cited in Hall v. Little, Case No. 5,939; Peterson v. The Chandos, 4 Fed. 649; Marine Ins. Co. v. St. Louis, I. M. & S. Ry. Co., 41 Fed. 653.]

2. The rule which restricts damages to such as may reasonably be supposed to have been contemplated by the parties, has no application to cases of tort.

3. When the owner of a tug agreed with the owner of a barge that both vessels should be employed in a freighting business, the wages of the servants of the association and expenses, except for repairs, to be paid out of the earnings, and the balance or profits to be divided between them in proportion to the stipulated values of the vessels; *held*, that this agreement constituted a partnership, and that either partner was liable in an action of tort for damages caused by the negligence of the servants and agents of the partnership, while conducting its business.

[Cited in The Henry Buck, 39 Fed. 213.]

[In admiralty. Libel by Warren O. Bowas against the Pioneer Tow Line to recover damages for personal injuries. Judgment for libellant.]

Milton Andros, for libellant.
Ed. B. Mastick and T. I. Bergin, for respondent.

HOFFMAN, District Judge. On September 23, 1870, the libellant, who was engineer of the stern-wheel steamer Pilot, was at work in her wheel, repairing her rudder heads. He had been so engaged but a few minutes, when her wheel was struck by a barge, which had shortly before been in tow of the steamer Pioneer, and which, having failed to make a landing at an adjacent wharf, drifted down upon the Pilot. The force of the blow, and the weight of the barge, which was laden with from 250 to 270 tons of freight, caused the wheel to revolve, and the libellant was jammed between the paddles and stern of the boat with great violence, thereby sustaining painful and severe injuries; to recover damages for which this action is brought.

The Pilot, at the time of the accident, was lying at Cowell's wharf, her usual and proper berth, to the use of which she had the exclusive right. The end of Front Street wharf, at which the barge attempted to land, was distant two hundred and eighty-seven feet, and it was parallel, though projecting further into the stream, to the end of Cowell's wharf, at the side of which the Pilot was lying. The collision occurred in broad daylight, between ten and eleven o'clock in the morning. The Pilot had arrived at her berth some hours previously, and was fastened to the wharf in the usual manner. It is not pretended that any vis major, or unexpected force of wind, or tide, forced the barge upon her, or that any thing could have been done by the steamer to avoid the collision.

The legal presumption, therefore, is that the accident was occasioned by the fault of the vessel in motion, and this presumption becomes conclusive when the circumstances are examined in detail. It appears that the barge had been towed by the Pioneer to within a short distance (variously estimated by the witnesses), from the end of Front Street wharf. She was then cast off, and a few moments afterwards a line was sent from the barge to the wharf. It was taken by some one not in the employ of the respondents and passed around a pile, but so unskillfully and imperfectly fastened, that it slipped as soon as a strain was brought to bear upon it. A second line was thereupon sent ashore and made fast, but it parted as soon as it was drawn taut. A third line was then taken to the wharf by a man in a skiff, but before it could check the motion of the barge, which had during all the time been slowly drifting towards the Pilot, the collision occurred. The barge was provided with an anchor, which could have been let go at a moment's notice. The tug was also near, and, it would seem, could without difficulty have taken hold of the barge and arrested her course. To cast off a heavily laden barge which has no means of controlling her own movements, trusting to her ability to get, without accident, a line ashore by which she may be brought up, may well be deemed, as the result in this case demonstrates, a want of proper care and caution, unless the tug remains in a position to render instant assistance if needed.

But the more obvious and unquestionable exhibition of skillfulness and want of diligence consisted in the failure to make fast the first line, when it was successfully sent ashore and even passed around a pile. Some evidence was adduced by the respondents to show a custom or usage in this port to send lines ashore to be made fast by the wharfinger, or any other person who may be casually on the wharf, and willing to take them. Whether such be the practice is immaterial. If masters of water craft choose to confide the performance of so important a service to unskilled or unknown persons, they do so at their own peril. They are as much

responsible for the want of skill and diligence of agents and servants so employed, as they would be if the servant had been expressly hired for the purpose. But especially, under the circumstances of this case, should that liability be enforced; for the line sent ashore was unprovided with a loop, which could readily have been slipped over a pile on the wharf. It was, therefore, necessary to make it fast by a knot; an operation which, the result in this case shows, requires some skill and practice. The parting of the second line also discloses a want of skill and diligence on the part of the respondents. It must have occurred from one of two causes. Either the line was insufficient, or the person in charge of it failed to slack it off, so as to bring a strain upon it gradually, and not by a sudden jerk. There is some evidence that the latter was the cause of its parting. But in either case the respondents were in fault.

There is also evidence tending to show that the tug might have taken hold of the barge, and prevented her from drifting down upon the Pilot. If so, she was bound to have gone to her assistance. The slipping of the first line, and the parting of the second, were observed by those in charge of the tug, and the danger of collision with other vessels, if the barge continued to drift, was obvious. If the tug, being near enough to render assistance, failed to do so, she was in fault. If she was too far off to be able to reach the barge in time, she was in fault in casting off a loaded barge, without means of locomotion, to take her chances of making a successful landing, at the risk of colliding with other vessels, in case of failure, while she herself removed to a distance too great to permit her to interpose to prevent accidents. The proofs do not show with certainty that the drifting of the barge could have been checked in time to avoid the accident, by letting go her anchor. It seems most probable that such would have been the effect. But at all events, the effort should have been made. It required but an instant to let the anchor go; and the consequences of allowing the barge to continue to drift were apparent. I think it clear on the foregoing facts, and they are substantially undisputed, that the collision was caused by the want of due care, skill, and diligence on the part both of the tug and the barge.

It is objected that the respondent, who is the owner of the tug, is not liable to this action. It is admitted that the Pioneer Tow Line is a corporation duly incorporated under the laws of this state.

In August, 1870, the Pioneer Tow Line entered into an agreement with the owners of the barge Hermann, substantially as follows: The barge was valued at $4,000, the Pioneer at $12,000. Joseph Francis, one of the owners of the barge, was to act as her captain at a salary of $70 per month, and was to hire her crew. The Pioneer Tow Line Co. was to man the Pioneer, and each party was to keep his vessel in repair at his own expense. The person in charge of the Pioneer was to make all engagements for carrying freight, collect all the earnings, and out of them pay all the running expenses of and supplies for both boats, and the wages of all persons employed on either. The barge was to carry all freight from any place on the Sacramento river to this city, the transportation of which might be contracted for by the man in charge of the Pioneer. Both vessels were to be under the general command and direction of the master of the Pioneer. The Pioneer was to tow the barge up and down the river in furtherance of the joint enterprise. The earnings after the payment of all expenses as above mentioned were to be divided in the ratio of four to twelve.

The vessels were running under this arrangement at the time of the collision. The Pioneer had two deck hands who worked upon the barge in loading and unloading cargo. The deck hands of the barge also worked upon the Pioneer in taking in coal, and also freight when the latter took any, which was but seldom.

It is, I think, evident that the parties to this agreement were not only liable as partners to third persons, but were such inter sese. The property used in carrying out the common enterprise was not, it is true, jointly owned by the partners. But this is not necessary to constitute a partnership. The capital stock of a partnership may consist in the use of property owned separately by the individual partners, or one partner may be the sole owner, and the other may contribute only skill and labor. It is sufficient if the partners agree to have a joint interest in, and to share the profits and losses arising from the use of property and skill either separately or combined. Meyer v. Sharpe, 5 Taunt. 74; Champion v. Bostwick, 18 Wend. 178. In the case at bar the parties contributed to the common stock, the one, the use of a steam tug, the other that of a barge. They were to be employed in carrying out the common enterprise, the use of each being indispensable to the other to accomplish its objects. The wages of the employees and the expenses of both vessels, excepting for repairs, were to be paid out of the earnings of both vessels, and the profits of the business were to be divided as such between the partners. The servants employed on either vessel were the servants of the association, and it seems performed services on board of either, as the necessities or convenience of the joint enterprise required. Under this agreement either party would clearly be entitled to an account of the earnings as against the other, and to a lien upon the fund as against his general creditors. Nor can it be doubted, that any person who furnished labor or supplies for the common enterprise might look to the partnership for his remuneration. A fortiori, must third

persons, who have been injured by the negligence of the servants and agents of the partnership while conducting its business, have the same right in an action of tort against either. Champion v. Bostwick, ubi supra; 1 Starkie, 272.

It is true that the somewhat arbitrary doctrine of Grace v. Smith, 2 W. Bl. 998, and Waugh v. Carver, 2 H. Bl. 235, by which the mere participation in the profits of an undertaking was held to create a partnership liability as to third persons, whatever the real relations of the parties inter sese, may be considered as overruled, both in England and America. Cox v. Hickman, 8 H. L. Cas. 268; Bullen v. Sharp, L. R. 1 C. P. 86; 1 Story, Partn. § 38; Denny v. Cabot, 6 Metc. [Mass.] 82; Colly. Partn. p. 33 et seq., in notes.

But all the cases agree that where there is a participation in the profits, as such, and no opposing circumstances exist to show that the portion of the profits is taken, not in the character of a partner, but in the character of an agent, and as a mere compensation for labor and services, where it appears that the alleged partner has an interest in the profits similar in character to that of the other partners; or, to use a term recently suggested, that those interests are homogeneous (Am. Law Reg. April, 1871 [Essay on the Criteria of Partnership, vol. 10, p. 215]), the party so participating in the profits will be liable as a partner to third persons, and would probably be so considered as between himself and his associates (Story, Partn. § 38; per Mr. J. Branwell, in Bullen v. Sharp, ubi supra).

In the present case, the interest of the parties in the profits was not only similar, but identical. The tort complained of was not, as in Champion v. Bostwick, committed by a servant, hired and paid by one of the partners, but by the servants of the partnership, who were paid out of the common earnings; and it was committed by them while engaged in the business of the partnership. For damages so caused, the partnership is unquestionably liable.

The libellant's right to recover is further resisted on the ground that he substantially contributed to the injury by his own negligence, in not more securely fastening the wheel before going into it. The contributory negligence, which will at common law bar the plaintiff's right to recover for an injury sustained by the fault of another, is the failure to exercise such care and diligence as men of ordinary prudence usually exercise under similar circumstances; and this will, of course, be in proportion to the probability of danger. 35 N. Y. 27; 31 Pa. St. 512; Smith, Repar. p. 79; Saund. Neg. 61; Shear. & R. Neg. p. 33, and notes.

The lashings by which the wheel of the Pilot was secured, were of the kind and strength always used on board the boat, whenever there was occasion to enter the

wheel. A few minutes before the accident, several men had gone into the wheel without objection, and the libellant himself, who was an engineer of considerable experience, and who had no motive to incur any unnecessary risk, appears to have entertained no apprehension of danger.

Under such circumstances it is difficult to say, notwithstanding that in the opinion of some of the witnesses the lashings should have been stronger, that, in neglecting to secure the wheel more firmly, he was guilty of culpable negligence, or disregarded the dictates of ordinary prudence. It is not denied that the lashings were strong enough to resist the action of the tide or waves, the swell of a passing vessel, or any other force which might be reasonably expected to be applied to the wheel. All ordinary accidents were, therefore, provided against. The libellant was not bound to take extraordinary precautions against the consequences of the negligence of others. The law will not account it a want of ordinary prudence, if he has acted on the presumption that others will act, in accordance with their obvious duties. Shear. & R. Neg. p. 34, and cases cited; Newson v. New York C. R. Co., 29 N. Y. 390. Nor can the wrong-doer accuse him of culpable negligence in failing to take extraordinary precautions to prevent the injurious consequences of a wrong which he was under no obligation to anticipate, and was powerless to prevent. Tonawanda R. Co. v. Munger, 5 Denio, 266.

If, as appears to be contended by the respondent, the libellant was bound to take precautions, not only against ordinary accidents, and such as might reasonably be expected, but also against extraordinary dangers caused by the negligence of others, and should, therefore, have secured the wheel in such a manner as to render this collision innocuous, what limits can be assigned to the precautions he was bound to observe?

If against this collision, should he also have secured himself against the consequences of a collision with a larger vessel; and, if so, how much larger, and moving at what velocity? He was certainly not called upon to provide against any and all collisions, which the negligence of others might occasion; and, if not against all, why against this? It is sufficient if, while lying in a slip to which his boat had the exclusive right, with no reason to apprehend danger from any other vessel, he has exercised the usual care and diligence, which common prudence suggested, to avoid the ordinary dangers which he might reasonably anticipate. If he has done so, the respondent has no right to say to him, "if you had foreseen my negligence, and the lashings had been stronger, the consequences of my tort might have been less injurious," any more than the master of a vessel who has, by his own fault, caused damage to another, has a right to refuse full compensation for the damage sustained, on

the ground that, if the injured vessel had been stronger, the injury would have been less.

But even if this defense were admissible, the testimony fails to sustain it. It does not appear that even if the lashings had been all that some of the witnesses require, they would have been sufficient to resist the force of the collision. The weight and momentum of the barge caused them to part instantly. Whether or not the force was sufficient to have caused stronger lashings to part, or to break the paddles or the cross-beam to which they were fastened, is purely conjectural; and until it is satisfactorily shown that it was not, there is no ground for the assertion that the supposed negligence in any degree contributed to the injury. Nor is it at all clear that the alleged negligence in this case, if any existed, was such as to bar the libellant's recovery.

It is not every act of negligence, even though without it the injury would not have occurred, which will be held to be contributory negligence, such as to defeat the action of the plaintiff. Thus where the plaintiff fettered the forefeet of his donkey and left him upon the highway, and the defendant negligently drove over and killed it, it was held by Lord Abinger that he was liable, notwithstanding that the donkey might have been improperly on the highway. Davies v. Mann, 10 Mees & W. 549; Mayor, etc., of Colchester v. Brooke, 7 Q. B. 376. So in Greenland v. Chaplin, 5 Exch. 243, 248, Pollock, C. B., said: "I think that where the negligence of the party injured did not in any degree contribute to the immediate cause of the accident, such negligence ought not to be set up as an answer to the action." So where the plaintiff was injured by the fall of an anchor on a steamboat, caused by a collision with the steamboat of the defendant, it was held no defense that the anchor might have been improperly stowed, or that the plaintiff was on a part of the deck where he ought not to have been. Greenland v. Chaplin, 5 Exch. 243. So where oysters were placed in a channel of a public navigable river, so as to create a public nuisance, yet a person navigating the river was holden not justifiable in negligently or willfully running his vessel against them, and so destroying them when he had room to pass without so doing. 7 Q. B. 377; Saund. Neg. p. 65.

It is perhaps not easy to deduce from the cases any precise and universal rule as to contributory negligence, but I think it may be affirmed that where, as in this case, the alleged negligence in no degree contributes to the happening of the accident; where the latter arises solely from the culpable negligence of the defendant; when it is doubtful whether any degree of diligence on the part of the plaintiff would have materially diminished the consequences of the defendant's fault, and the extent to which this might have been so diminished is incapable of ascertain-

ment—such negligence cannot be set up either to defeat the action or to mitigate the damages.

It is further contended, on the part of the respondent, that the libellant cannot recover for the bodily injury sustained by him, his pain and suffering, medical expenses, loss of time, etc., because these were not the natural consequences of the collision, and such as may reasonably be supposed to have been contemplated by the parties. In regard to consequential damages on the breach of a contract, the rule of the Code Napoleon (Code Civ. liv. 3, tit. 3, arts. 1149–1151), and of the Louisiana Code (articles 1928, 2294, 2295), that the debtor who has been guilty of no bad faith or fraud, is liable only for such damages as were contemplated, or may reasonably be supposed to have been contemplated by the parties, has been adopted in recent decisions in England and America. Hadley v. Baxendale, 9 Exch. 341; Fletcher v. Tayleur, 17 C. B. 21; Griffin v. Colver, 16 N. Y. 489. See Sedgw. Dam. (5th Ed.) p. 79 et seq.

The effect of this rule is more often to limit than to extend the liability for a breach of contract, although sometimes, where the special circumstances under which the contract was made have been communicated, damages consequential upon a breach made under those circumstances will be deemed to have been contemplated by the parties, and may be recovered of the defendant. But this rule, as Mr. Sedgwick remarks, has no application to torts. He who commits a trespass must be held to contemplate all the damage which may legitimately flow from his illegal act, whether he may have foreseen them or not; and, so far as it is plainly traceable, he must make compensation for it. But these cases, like those of contract, where damages are claimed, not on the ground that they were or should have been foreseen, but simply as the direct result of the breach, are subject to the limitation of the rule, which requires such damages to be certain and direct. Sedgw. Dam. p. 86, in note.

In the case at bar, no consideration is needed of the vexed questions, in regard to proximate and remote causes, or direct and consequential effects. The injury complained of, was the direct and immediate result of the collision occasioned by the respondent's negligence, as much so, as if the colliding vessel had herself struck the libellant. The damages he sues for were the natural and inevitable effects of that injury which have followed without the intervention of any other cause to enhance or modify them. They necessarily include a compensation for pain and suffering, for loss of time, for medical attendance and support during the time that he has been disabled, and for such permanent injury or continued disability as he has sustained. The amount of this compensation remains to be determined.

As soon as possible, after the occurrence of the accident, the libellant was extricated from his perilous position, carried on the wharf, and laid upon a mattress. A physician who happened to be near was summoned. He found him insensible, with breathing hurried and labored, and moaning from intense pain. After ascertaining that none of the long bones were broken, the physician directed him to be carried to his hotel on a lounge procured for the purpose. On arriving at the hotel he was examined by the physician who had been called to him, and, also, by his family physician. He was found by them to be suffering great pain, and the slightest movement of his body, or left limb, caused him to scream in agony. He complained of inability to see, and suffered from retention of urine. The latter symptom passed off, however, in a couple of days. On a subsequent examination, the physicians became convinced that he had sustained a fracture of the crest of the ilium. Dr. Scott testifies, that on placing his hand on the crest of the ilium, he discovered mobility and crepitus. About the thirteenth day symptoms of tetanus were observed, but they disappeared without serious consequences.

The libellant was confined to his bed for six weeks from the time of the injury. For two weeks thereafter, he was able merely to move about his room on crutches. Before the accident he was a man of unusually robust and healthy constitution, never having been sick, as he states, a day in his life.

At present he complains of constant pain in his back, inability to use his limb which is smaller, and, as some of the physicians think, shorter than the other. He is unable to dispense with crutches, and at present incapable of performing any labor requiring ordinary strength and activity. As to his chance of final recovery the physicians disagree. Those who have recently examined him, discover no traces of a fracture of the ilium, and are of opinion that none such could have existed. They admit, however, that if other physicians detected shortly after the accident mobility and crepitus, those indications would be conclusive. Some of the physicians express a confident expectation of an ultimate complete recovery, while others consider it impossible that he can be restored to his former condition.

There seems to be reason to apprehend that the nerves of the sacrum, or perhaps the spinal column, have sustained an injury, the nature or consequences of which cannot be known. A year appears to be the shortest time in which a full restoration is expected by the most sanguine of the physicians. At the time of the injury the libellant was earning one hundred and twenty-five dollars per month, and his board, estimated at fifty dollars—in coin. This, from the date of the accident to March 23, the day of trial, would amount to one thousand and fifty dollars in

coin, or about one thousand one hundred and fifty dollars in legal tenders at ninety-one cents. His expenses for medicine and medical attendance have amounted at the customary rates to about three hundred and seven dollars in currency. The compensation for mental and physical suffering, and the indemnity for the inability of the libellant to pursue his ordinary calling until his complete recovery, if that ever takes place, are not susceptible of definite computation.

It has appeared to me, considering on the one hand that it is by no means certain that he will ever be entirely restored to health; and on the other, that a substantial cure may be effected at no very remote day, and that in the meantime he is not wholly incapacitated from pursuing certain avocations, the sum of five thousand dollars is a just amount to be allowed him.