Bartley, J.
A maxim of the law, tested by the wisdom of centuries, exacts of every person, in the enjoyment of his property, the duty of so using his own as not to injure the property of his neighbor. It is in accordance with this principle, that it has been held, that though a person do a lawful thing, yet, if any damage 176] thereby befalls another, which he *could have avoided by reasonable and proper care, he shall make reparation. Hence the general rule, that in all cases where damage accrues to another, by the negligence or improper conduct of a person in the exercise of his peculiar trade or business, an action is maintainable. Shiells v. Blackburne, 1 Hen. Blacks. 158; Moore v. Morgue, Cowp. 480; Buller’s N. P. 73; Broom’s Legal Maxims, 248.
How far this doctrine is applicable to railroad companies in the exercise of their peculiar business, is the question presented in the *177 case before us. The court below refused to charge the jury, on request, that, if they found from the evidence, that the defendant’s agents could, in the use of ordinary care, have easily and safely avoided the destruction of plaintiff’s property, by checking the speed of the train, the defendant would be liable; but on the contrary, instructed the jury, that as the hogs were improperly on the railroad, the defendant’s agents were not bound to check the ordinary and usual speed of the cars, or use any means or caution, to save the plaintiff's property. The position taken by the court below, assuming the animals to have been unlawfully on the railroad, would justify not only a wanton disregard of the plaintiff’s property, but even an intentional destruction of it by defendant’s agents, providing it occur while running the train over the railroad in the ordinary way, and at the usual speed.
Railroad companies have become important and useful public agents, affording vast facilities for trade and travel, and producing extensive results upon the social condition, as well as the business of the country. But while it is important that they bo fully .protected in the appropriate and legitimate exercise of their powers, it is just that private individuals be secured from injury, or invasion of their rights, by the mode or manner in which railroad companies exercise their peculiar functions. The obligation to make reparation for damage done'to another by a person in the improper manner in which he exercises his own appropriate employment, often requires great nicety of discrimination ; and the application *of this injunction to railroad companies in their peculiar [177 business, so widely differing from the ordinary pursuits of persons, must frequently become a matter of no inconsiderable difficulty.
It is claimed on the part of the defense in this case :
1. That it is the duty of the owner of domestic animals to keep them on his own lands or within his own inclosures; and that if they wander from his own lands and get upon the uninclosed lands of his neighbors, they will be unlawfully there, and the owner guilty of a trespass.
2. That the plaintiff being in fault, and guilty of an unlawful act in allowing his hogs to escape from his own lands and get upon the railroad, he can not maintain an action for the value of the animals killed by 'the defendant while in the .prosecution of its lawful business, even although the agents of the company mi'ght have *178 readily and safely avoided injury to tbe animals by tbe exercise of ordinary care and prudence in the management of the train of cars.
The doctrine that the owner of cattle, hogs, horses, etc., is bound to keep them on his own lands, or within an inclosure, and that he becomes a wrong-doer if any of them escape or stray off upon the lands of another person, although uninelosed, is said to be derived from the common law of England, and to be in force in this state. At an early period in this state the common law of England and the statutes of that country of a general nature, in aid of the common law, passed prior to the fourth year of King James I., were adopted by legislative enactment. But this act was repealed by the general assembly of this state on the 2d of January, 1806; since w'hich time the common law of England has had no force in this state derived from legislative adoption. But having been adopted in the original states of the Union and introduced into Ohio at an early period, the common law has continued to be recognized as the rule of decision in our courts, in the absence of legislative enactments, so far as its rules and principles appeared to be based on sound reason, and applicable to our condition 178] *and circumstances. The common law, therefore, has no force in Ohio, except so far as it derives authority from judicial recognition in the practice and course of adjudication in our courts; and this extends no further than it illustrates and explains the rules of right and justice as applicable to the circumstances and institutions of the people of the state. In the case of Sergeant v. Steinberger, 2 Ohio, 305, the Supreme Court held that the common law, so far as it related to the subject of the estate by joint tenancy, would not be recognized in Ohio, upon the ground that the jus accrescendi was not founded in principles of natural justice, nor in any reasons of policy applicable to our state of society or institutions; but on the contrary, was adverse to the understandings, habits, and feelings of the people.
Admitting the rule of the common law of England in relation to cattle and other live stock running at large to be such as stated, the question arises whether it is applicable to the condition and circumstances of the people of this state, and in accordance with their habits, understandings, and necessities. If this be the law in Ohio now it has been so since the first settlement of the state, and every person who has allowed his stock to run at large and go upon the uninclosed grounds of others has been a wrong-doer, and *179 liable to an action for damages by every person on whose lands his creatures may have wandered. What has been the actual situation of affairs, hnd the habits, understandings, and necessities of the people of this state from its first settlement up to the present period in this respect ? Cattle, hogs, and other kinds of live stock not known to be breachj^ and unruly, or dangerous, have been allowed at all times and in all parts of the state to run at large and graze on the range of uncultivated and uninclosed lands. And this prevails not only throughout the country, but also in the villages and cities, except where it may be, to a limited extent, restrained by local municipal ordinances. For many years, in the early settled parts of the state, the people were unable, and at the present time in some parts of the state, they are yet *unable [179 to clear and inclose more ground than that actually needed for cultivation. And there is not at this time inclosed pasture lands sufficient to confine the one-half of the live stock in the state. Even a statutory enactment, imposing the severest criminal punishment for permitting these animals to run at large, could not be enforced without either slaughtering or driving a large portion of them from the state. It has been the habit of the people to inclose their grounds for the purpose of cultivation, and to fence against the animals running at large. And it has been only within a few years, and that only in the better improved parts of the state that uncultivated pasture grounds have been inclosed. And this has not been done because the owners considered themselves required by law to confine their stock within inclosures, but for their own convenience and advantage. So that it has been the general custom of the people of this state, since its first settlement, to allow their cattle, hogs, horses, etc., to run at large, and range upon the uninelosed lands of the neighborhood in which they are kept; and it has never been understood by them that they were tort feasors, and liable in damages for letting their stock thus run at large. The existence or inforcemont of such a law would have greatly retarded the settlement of the country, and have been against the policy of both the general and the state governments.
The common understanding upon which the people of this state have acted since its first settlement has been that the owner of land was obliged to inclose it with a view to its cultivation; that without a lawful fence he could not, as a general thing, maintain an action for a trespass thereon by the cattle of his neighbor running *180 at large; and that to leave uncultivated lands unincloscd was an implied license to cattle and other stock at large to traverse and graze them. Not only, therefore, was this alleged rule of the common law inapplicable to the circumstances and condition of the people of this state, hut inconsistent with the habits, the interests, necessities, and understanding of the people.
180] ^Besides this, the legislation of the state has put at rest all question as to the existence of any such rule in Ohio. The proviso in the first section of the statute in relation to strays, recognizes the fact of animals being allowed to run at large upon the range of uninclosed lands, in the following language :
“ Provided, That no person shall be allowed to take up any neat cattle, sheep, or bog's, after the first • day of April and before the first day of November, annually; nor shall any compensation or fees be allowed to any person for taking up any stray animal from the range where such animal usually runs at large f etc. Swan’s Rev. Stat. 883.
The statute regulating inclosures, and providing against trespassing animals (see Swan’s Rev. Stat. 426), fixes the requisites of a lawful fence, and in the seventh section provides the remedy when the owner or occupant shall feel himself aggrieved by the animals of another person which run at large breaking into his inclosure; and the twelfth section of the same statute provides that when the fence-viewers shall ascertain any animals to be habitually breachy and unruly, notice thereof shall be given to the owner or keeper-, who shall be required thereafter, under a penalty, to restrain such animals from running at large, etc.
This legislation is wholly inconsistent with the doctrine that it is unlawful for the owner of animals to allow them to run at large, and that he is liable in damages for a trespass in case they go upon the uninclosed grounds of another. Why the provision to restrain breachy and unruly animals from running at large, if it were the law of the state that the owner should allow none of his stock to be at large, whether breachy or not? And why the provision for the assessment of damages for injury by trespassing animals made to depend upon the contingency of a lawful fence ? If the owner of trespassing animals were liable in damages, whether the lands of the injured party were inclosed or not, the provision making the assessment of damages to depend on the existence of a lawful fence would seem to be unnecessary, if not wholly absurd.
*181, 182 *It was adjudged, by the Supreme Court of Connecticut, [181 in the case of Stadwell v. Ritch, 14. Conn. 293, that the rule of the English common law, making it the duty of the owner of cattle to restrain them and subjecting him to liability in damages for suffering them to go upon the lands of another, whether inclosed or not, does not prevail in that state, being inconsistent with the situation of the country from the time of the first settlement of the state, and also repugnant to the legislative enactments of the state relating to that subject. On the contrary, it was held that the owners of lands were obliged to inclose them by a sufficient fence before they could maintain an action for trespass done thereon by the cattle of another. The same doctrine was laid down by Judge Swift (see 1 Swift’s Dig. 525), and also recognized in the case of Barnum v. Vandusen, 16 Conn. 200.
It has been said that in South Carolina a sufficient inclosure was necessary to protect the planter against the inroads of horses, cattle, and hogs, whose right to go at large in the range is derived from the common law of South Carolina. Town of Beaufort v. Danner, 1 Strobhart, 175.
It was held by the Supremo Court of the State of Illinois, in the case of Seely v. Peters, 5 Gilman, 130, that the common law requiring the owner of cattle, hogs, etc., to keep them on his own land, has never been in- force in Illinois ; that there is no general law in that state prohibiting cattle from running at large; and that in order to maintain an action for the trespass of cattle on land, the owner of the land must have it' surrounded by a sufficient fence. The subject -was fully investigated in this case, and the ground on Which the decision is placed, is that the common-law rule is inapplicable to the circumstances and condition of the people, and also inconsistent with the legislation of the state.
It is true that the contrary doctrine has been held in a number of the other states, but the grounds upon which it is placed do not appear to have any real practicable application *to the condition [182 of things in this state. It is said that the purpose of fences, in the view of the common law, is to keep the owner’s cattle in, and not cattle of others out. The Tonawanda Railroad Co. v. Munger, 5 Denio, 255. The reason of a law should never rest in mere abstraction, without any application to the practical affairs of society, and it is a maxim that when the reason of a law ceases, the law itself ceases. Fences have two sides to them, and the real and *183 practical purpose of fences in this state has been not only to protect the inclosuros of the proprietor from, the intrusion of animals without, but also to confine such as may be kept within.
If an action for damages be maintainable for every instance in which the cattle and other live stock of a person go upon the uninclosed lands of another, without express license, more than nine-tenths of the business men of the state become, for this cause, tort feasors every day of the year, and liable to suit for damages. It will not do to say, that although such right of action existed, yet that it would be restrained by the rule de minimus non curat lex. This would be a refinement resulting in a distinction without a difference. As there can be no wrong without a remedy,, if there ■could be no recovery, the right of action in reality could not exist.
This doctrine of the common law may be suitable to an old and highly cultivated country, where all the lands except the public highways and commons are uuder inclosuro, but it has no suitable and proper application in Ohio.
There is no law in Ohio, therefore, requiring the owner of cattle, horses, hogs, or other live stock, to keep them on his own ‘land or within an inclosure; and when he allows them to be at large on the range of uninclosed lands, he can not be said to act unlawfully, or to be guilty of an omission of ord/inary care in the keeping or charge of his stock; for, by so doing, he does nothing more than that which has been customary, and which has been by common consent done 183] generally by the people since the first settlement of the *state. It is true, that extraordinary diligence, or the highest degree of care in the management of his stock, would require the owner to confine it in stables, or within sufficient inclosures; but under ordinary circumstances, all that can be required of a person in the management of his property is, to exercise that degree of care and diligence which men of common prudence (or in other words, which men in general) exercise in taking care of their own property.
This right, however, to allow animals to run at large has its qualifications. The owner of animals known to be mischievous or dangerous, is bound to confine them; and if he omit this duty he is responsible for any loss or damage which any other jterson may suffer thereby. And whenever the owner is notified of the fact that any of his creatures at large have become troublesome by means of breachy, unruly, or dangerous habits, it is his duty to take them up without delay, and confine them. And the right to allow animals *184 inoffensive in their habits to run at large, does not imply a right in the owner to keep his creatures upon another’s uninclosed lands against his consent. On the contrary, the owner of the lands may drive them off as often as they intrude upon his possessions, using no unnecessary violence; or he may at any time exclude them permanently, by the erection of a fence or other means of in closure. And although there is no law in this state requiring any person to fence or inclose his grounds, yet the owner who leaves his lands uninclosed, takes the risk of intrusions upon his grounds from the animals of other persons running at large; and the owner of the animals, in allowing them to be at large, takes all the risk of their loss, or of injury to them, by unavoidable accidents arising from any danger into which they may wander.
Applying the views here expressed to the case under consideration, upon what ground does the plaintiff’s claim to reparation in damages rest? Where there is wanton, malicious, or intentional-injury done to a person, there is usually no difficulty in determining the liability of the wrong-doer; *but where a party suffering [184 loss seeks redress upon the ground of mere negligence, or the omission of ordinary care on the part of another in the conduct or manner of prosecuting his lawful business, there are often difficulties requiring close attention, and sometimes the utmost nicety of discrimination.
Admitting the plaintiff’s right to allow his domestic animals to run at large under ordinary circumstances, it is claimed that the defendant, having appropriated its railroad track to the exclusive purpose of running its locomotives and trains, and having the undoubted right to pass over its road, unmolested, at usual railroad speed, the plaintiff’s hogs had no right to be on the track, and were wrongfully there; and that the plaintiff, in allowing them to be at large in the vicinity of the railroad, where danger was apparent, was in fault; and that the injury, therefore, having been caused in part at least by the negligence of the plaintiff, he can not maintain the action.
The defendant’s right to the exclusive and unmolested use of its railroad track is undeniable; and it must be conceded that tbo plaintiff had no right to have his hogs on the track, and that they were there improperly. But how came they there ? If the plaintiff had placed them there, or, knowing them to be there, had omitted to drive them off, he would have been, perhaps, precluded from all claim to compensation; but it would appear that, in the exercise of *185 the ordinary privilege of allowing these animals to be at large, by the plaintiff, they accidentally, and without his knowledge, wandered upon the railroad track. The right of the defendant to the free, exclusive, and unmolested use of its railroad, is nothing more than the right of every other land proprietor in the actual occupancy and use of his lands, and does not exempt it from the duty enjoined by law upon every person so to use his own property as not to do any unnecessary and avoidable injury to another. Finding the animals upon the track, it was the right, and indeed the duty, of the agents of the company to drive them off, but not to injure or 185] destroy *them by unnecessary violence. The owner of a freehold estate in lands, inclosed by a lawful fence, has the right to expel trespassing animals which have broken through his inclosure; but, in doing so, he would become liable in damages to the owner of the animals, if they be injured by the use of unnecessary and improper means; although the latter would be bound to make reparation for the injury done to the-former, by the trespassing animals. It is not pretended that the railroad of the defendant was under inclosure, through which the plaintiff’s creatures had broken. It is true there is no law in Ohio requiring railroad companies to fence their roads. But when they leave their roads open .and unfenced, they take the risk of intrusions from animals running at large, as do other proprietors who leave their lands uninclosed. If a farmer undei’take to cultivate his ground in corn without inclosing it, he would doubtless be troubled by the destructive intrusions of cattle running at large, but without a sufficient fence, he could not maintain an action against the owner of the animals for the trespass. Had the defendant protected its railroad by a sufficient fence and cattle-guards, and the plaintiff’s animals broken over the inclosure and gone upon the railway track, the plaintiff would no doubt, have been liable to the company in damages for the trespass of the animals. The defendant constructed its railroad with a knowledge that it was the common custom of the. country to allow domestic animals to run at large upon the uninclosed grounds of the.neighborhood; and without the precaution of inclosing its railroad, the company could not sustain an action against the owner of such animals at large, as might happen to wander upon the track of the road.. The owner of the animals, in allowing them to run at large, takes the risk of the loss or injury to them by unavoidable accident; and the comjDany, *186, 187 in leaving its road unprotected by inclosure, runs the risk of the occasional intrusions of such animals upon its road, without any remedy against the owner.
*The question in this case, however, is what decree of care, [186 if any, was the defendant bound to use under the circumstances, to avoid injury to the plaintiff’s propei’ty ? That the plaintiff was in the exercise of the highest degree of care over this property, can not be fairly claimed. A very prudent .man would not allow his stock to run at large in the immediate vicinity of an uninclosed railroad, where the animals might accidently, and without his knowledge, wander off upon the railway track. -The plaintiff, therefore, being in one respect in fault, it is claimed that he can not maintain his- action, even although the defendant could have avoided injury to the animals by the use of ordinary care and caution. '
It is true that a pllrty in an action for negligence can not recover damages which have resulted from his own negligence and want of care ; and it has been hold that the party seeking the redress, must not only show his adversary to be in the wrong, but also must be prepared to prove that no negligence of his own has tended to increase or consummate the injury. But the doctrine that where both parties are in fault, the party sustaining the injury can not recover, is subject to several very material qualifications. An effort has been made, however, to sustain its general application upon the idea of a mutuality of obligation to observe due care and caution; and that negligence by one person, absolves another from the duty of care and diligence toward him. In the case of The Tonawanda Railroad Company v. Munger, 5 Denio, 266, the court said: “Negligence is a violation of the obligation which enjoins care and caution in what we do. But this duty is relative, and where it has no existence between particular parties, there can be no such thing as negligence in the legal sense of the term. A man is under no obligation to be cautious and circumspect toward a wrong-doer.” This idea, however, that the liability in damages for negligence depends upon any mutuality of obligation, is more fanciful than real. Puffendorf places the right *to reparation [187 upon the ground of an original moral duty, in language both graphic and expressive, as will appear by the following extract:
“ In the series of absolute duties, or such as oblige all men ante *187 cedently to. any human institution, this seems with justice to challenge the first and noblest place, that no man hurt another; and in case of any hurt or damage done by him, he fail not to malte reparation. For this duty is not only the widest of all in its extent, comprehending all men, on the bare account of their being men; but it is at the same time the most easy of all to be performed, consisting, for the most part, purely in a negative abstinence from acting,'except that its assistance is sometimes necessary in restraining the laws and passions, when they fight and struggle against reason, among which rebellious desires, that boundless regard which we sometimes show to our own private advantage, seems to be the principal and the ringleader. Besides, it is the most necessary of human duties, inasmuch as a life of society can not possibly be maintained without it. For suppose a man to do me no good, and not so much as to transact with mo in the common offices of life, yet, provided, he do me no harm, I can live with him in some tolerable comfort and quiet.” ....
“ It is beyond doubt that he who offers damage to another out of an evil design, is bound to make reparation, and that to the full value , of the wrong, and of all the consequences flowing from it. But those likewise stand responsible who commit an act of trespass, though not designedly, yet by such piece of neglect as they might easily have avoided. For it is no inconsiderable part of social duty to manage our conversation with such caution and prudence that it do not become terrible or pernicious to others; and men under some circumstances and relations are obliged to more exact and watchful diligence. Indeed, the slightest default in this point is sufficient to impose a necessity of reparation, unless under one of these -exceptions, either that the nature of the business was such as disdained a care more nice and scrupulous, or that the party who receives the wrong is no less in fault than he who gives it; or, lastly, that some perturbation of mind in the person, or some extraordinary circumstances in the affair, leaves no room for accurate and considerate circumspection; as suppose a soldier in the heat of an engagement - should hurt his next man with his arms while he brandishes and employs them against the enemy. To this purpose the story in JSlion is remarkable. A young man traveling toward Delphi, as ■ he defended his companion from the robbers, happened to kill him by an unlucky turn of his weapon; and, upon application to the Oracle, received his pardon in this comfortable answer:
“Striving to save your hapless friend, you ’ve slain;
His blood may purify, but ne’er can stain.”
“But in cases of pure chance, where the hurtful action is not mixed with any fault of ours, it is evident we are not obliged to reparation. For when I have done nothing that can be fairly laid to my charge, there seems to bo no reason why the misfortune and the damages of a harm, which I unwillingly caused, should rather fall *188 on me than on the person who received it.” 3 Puffendorf’s Laws of Nature, chap. 1. ,
*Rutherforth, in his Institutes of Natural Law (p. 201), gives [188 the origin of the right to reparation in damages in the following language:
“ As the law of nature forbids us to hurt any man, it can not allow any act of ours whereby another is hurt to stand good, or to obtain any effect. But the law, if it does not allow such act to stand good, or to obtain any effect, must, after we have done it, require us to undo it again. The only way of undoing it again, or of preventing the effect of it — that is, the only way of satisfying the law— is to make amends for what any person has suffered who was hurt by it, or to make reparation for the damages which such person has sustained. The same law, therefore, which guards a man from being hurt by requiring others not to hurt him, gives him a demand upon them, when they have done him any hurt, to undo it again, or give him a right to demand reparation of damages. If such reparation be refused, the law gives him a right to it, and allows him to support this right by all such means as are necessary for that purpose, because a right which he is not at liberty to enforce or bring into execution, is, in effect, no right at all.”
It would seem that the liability to make reparation for an injury rested not upon the consideration of any reciprocal obligation, but upon an original moral duty, enjoined upon every person so to conduct himself, or exercise his own rights, as not to injure .another. It is conceded that where the conduct of the party complained of has been malicious, or his negligence so wanton and gross as to be evidence of voluntary injury, the injured party is entitled to redress, although there has been negligence on his part. Wynn v. Allard, 5 W. & S. 524; Munroe v. Leach, 7 Met. 274; Farwell v. Boston & Worcester Railroad Company, 4 Met. 49. But where the injury arises neither from malice, design, .nor wanton and gross neglect, but simply the neglect of ordinary care and caution, and .the parties are mutually in fault, the negligence of both being the immediate or proximate cause of the injury, it would seem that a recovery is fairly denied, upon the ground that the injured party must be taken to have brought the injury upon himself. For the parties being mutually in fault, there can be no apportionment of the damages, no rule existing to settle in such case what the one shall pay more than the other.
*189, 190 189] *This rule, however, that where' both parties are in fault, and the negligence of each a proximate cause of the injury, no action will lie, has been chiefly applied to cases of collision between vessels, carriages, etc., passing on the public thoroughfares.
The mere fact, however, that one person is in the wrong, does not in itself discharge another from the observance of due and proper care toward him, or the duty of so exercising his own rights as not to injure him unnecessarily. • There have been numerous adjudications both in England in this country, where parties have been held responsible for their negligence, although the party injured was, at the time of the occurrence culpable, and in .some of the cases, in the actual commission of a trespass.
In the case of The New Haven Steamboat and Transportation Co. v. Vanderbilt, 16 Conn. 421, the Supreme Court of Connecvticut held it to be a principle of law, that while a party, on the ¡one hand, shall not recover damages for an injury which he has ‘brought upon himself, neither shall he, on the other hand, be permitted to shield himself from an injury which he has done, because the party injured was in the wrong, unless such wrong contributed to produce the injury; and even then it would seem that the party setting up such defense is bound to use common and ordinary caution to be in the right. This decision was founded on the authority of Butterfield v. Forrester, 11 East, 58, in which Lord Ellen-borough said: “A party is not to cast himself upon an obstruction which has been made by the fault of another, and avail himself of 'it, if he do not himself use common and ordinary caution to be in the right. In cases of persons riding upon what is considered to ¡be the wrong side of the road, that would not authorize another ¡purposely to ride up against them.”
In the case of Birge v. Gardiner, 19 Conn. 507, where the defendant having set up a gate on his own land, by the side of a lane ••through which .the plaintiff, a child between six and seven years ¡of age, with other children in the same neighborhood, were accus190] tomed to pass from their places of ^residence to the highway, the plaintiff, in passing along such lane, without the liberty of'any • one, put his hands on the gate and shook it, in consequence of which it fell on him and broke his leg, the Supreme Court of Conmecticut said : “ There is a class of cases in which defendants have rbeen holden responsible for their misconduct, although culpable acts of ,trespass by the plaintiffs produced the consequences;” andheld in this *191 case that if the defendant was guilty of negligence, he was liable for the injury, unless the plaintiff, in doing what he did, was guilty of negligence or misbehavior, or of the want of proper care and caution; and that in determining this question it was proper to take into consideration the age and condition of the plaintiff, etc., and that the fact that the plaintiff was a trespasser in the act which produced the injury complained of, would not necessarily preclude him from a recovery against a party guilty of negligence.”' This decision was sustained by the authority of Lynch v. Nurdin, 1 Adol. & Ellis, 35 (2 Stephen’s Nisi Prius, 1015), which was an action for negligence committed by the defendant’s servant, in leaving his cart and horse standing for half an hour in an oj>en street, and while there the plaintiff, with other children, got into and about the cart, and teased the horse, which moved, whereby the plaintiff was injured. Lord Denman, C. J., said:
“ In the present case the fact appears that the plaintiff has done wrong; he had no right to enter the cart, and, abstaining from doing so, he would have escaped the mischief. Certainly he was a co-operating cause of his own misfortune, by doing an unlawful act; and the question arises whether that fact alone must deprive the child of his remedy. The legal proposition, that one who has, by his own negligence, contributed to the injury of which he complains, can not maintain his action against another in respect of it, has received some qualifications. Indeed, Lord Ellenborough’s doctrine in Butterfield v. Forrester, which has been generally adopted since, would not set up the want of a superior degree of skill or care as a bar to the claim for redress. Ordinary *care [191 must mean that degree of care which may reasonably be expected from a person in the plaintiff’s situation.” ,
The same doctrine was substantially recognized in the case of Chaplin v. Hawes et al., 3 Carr. & Payne, 554, in which Best, C. J., remarks:
“If the plaintiff’s servant had such a clear space that he might easily have got away, then, I think, he would have been so much to blame, as to prevent the plaintiff’s recovering. But, on the sudden, a man may not be sufficiently self-possessed to know in what way to decide; and in such a case, I think the wrong-doer is the party who is to be answerable for the mischief, though it might have been prevented by the other party’s acting differently.”
In the case of Bird v. Holbrook, 15 Eng. Com. L. 91, it was held, *192 that where the defendant, who, for the protection of his property, some of which had been stolen, set a spring-gun, without notice, in a walled garden, at a distance from his house, and the plaintiff having climbed over the Wall, in pursuit of a stray fowl, was shot, he (the defendant) was liable in damages, although the plaintiff brought the injury upon himself by trespassing upon the defendant’s inclosure.
The case of Vere v. Lord Cawder, 11 East, 567, was an action of trespass for shooting and killing a dog of the plaintiff, in which it was hóld that a plea in bar constituted no justification, which set forth that the lord of the manor was possessed of a close, and that the defendant, as his game-keeper, killed the dog when running after hares in that close for the jDreservation of hares, the plea not averring that it was necessary to kill the dog for the preservation of the hares, etc. In this case, Lord Ellenborough, C. J., said : “ The question is, whether the plaintiff’s dog incurred the penalty of death for running after a hare in another’s "ground ? And if there be any precedent of that sort, which outrages all reason and sense, it is of no authority to govern other cases.”
192] *The same doctrine was recognized in the case of Mariott v. Stanly, 39 Eng. Com. L. 559. Also in the case of Raisin v. Mitchell et al., 38 Eng. Com. L. 252, in which a jury returned a verdict in favor of the plaintiff — for £250 — with a special finding, on inquiry, that there were faults on both sides; and it was held that notwithstanding this, the plaintiff was entitled to the verdict, as there might ' be faults with the plaintiff to a certain extent, and yet not to such an extent as to prevent his recovering. The same subject was very fully considered in the case of Deane v. Clayton, 2 Eng. Com. L. 183, in which Dallas, J., remarks: “To the next class of decisions I also equally accede; namely, those which establish that you shall do no more than the necessity of the case requires, when the excess may be in any way injurious to another; a principle which pervades every part of the law of England, criminal as well as civil, and indeed belongs to all law that is founded on reason and natural equity.”
It is upon this ground, that where domestic animals even, which are breachy and unruly, break into the lawful inclosure of another, the owner of such inclosure, although he has a right of action for the trespass, and has the right to expel the trespassing animals from his grounds, and that quickly, and with no very kind treatment ; yet, in so doing, he is not allowed to use unnecessary or ex- *193 nessive violence-; and if lie does, and the animals be killed or injured thereby, he will be liable to the owner of the animal in damages. This is in strict accordance with the decision in the case, Vere v. Cawder, above mentioned. To the same effect is the case, of The Mayor of Colchester v. Brooke, 33 Eng. Com. L. 376, cited in 1 Smith’s Leading Cases, 312, where it was held, that although the plaintiff was chargeable with wrong and negligence in placing and keeping the- deposit of a bed of oysters in the channel of a navigable Stream, which created a public nuisance, yet the defendant was not justifiable in running his vessel upon the deposit, greatly injuring the oysters-, when there was room to pass in the stream without it, and the injury could have been avoided by the *use-of reason- [193 able care and diligence. This is only carrying ou,t the rule, that though a man do a lawful thing, yet if any- damage thereby be done to another, which he could have reasonably and properly avoided, he will be held liable.. So, it. is said, if a man lop a tree- on his own ground, and the boughs fall upon another’s premises, ispo. invito, and do an injury, an action lies. So, also, where a man, in building his own house, lets fall a piece of timber on his neighbor’s house, and injures it; and likewise, where a party so negligently constructed a hay-rick on the extremity of his land, that in consequence of its spontaneous ignition, his neighbor’s house was burnt down, an action has been sustained. Vaughan v. Menlove, 3 Bing. (N. C) 468,
And where persons have the control of instruments of danger, the law, out of regard to the safety of the community, requires them to be kept with the utmost eare; so that where a. party being possessed of a loaded gun, sent a young girl after’- it, with directions to take the priming out, which was accordingly done, but a damage was done to the child of another person, in consequence of the girl presenting the gun at him, and drawing the trigger, when the gun went off, the party was held liable in damages to the person injured. Dixon v. Bell, 5 M. & S. 198.
Another modification of the rule, that the concurrence of the plaintiff’s negligence with that of the defendant, will defeat the claim to reparation, is, that where the plaintiff, knowing the danger, voluntarily placed his property in an exposed, and hazardous position, or in more than ordinary danger, from the lawful acts of the defendant. Sedgwick on Damages, 471. This principle was settled by the Supreme Court of New York, in the case of Cook v. The *194, 195 Champlain Transportation Company, 1 Donio, 99, in which, it was held that where a person, in the lawful use of his own property, exposes it to the danger of accidental injury from the lawful acts of others, he does not thereby lose his remedy for an injury caused by the culpable negligence of such other persons; so that the owner 194] of land on the shore of a ^stream or lake, or adjoining the track of a railroad, may lawfully build on his land, though the situation be one of exposure'and hazard, and be nevertheless entitled to protection against the negligent acts of persons lawfully passing the same with vessels or carriages propelled by steam engines, by which said buildings may be set on fire, on the ground that the owner undertook the risk and hazard of injury by mere accident, but not the risk of injury by negligence.
But there is yet another element in this class of cases, which occasionally has an important bearing upon the right of redress. The negligence of the injured party to preclude him from a recovery, must be in part, at least, an immediate or proximate cause of the injury. To this effect was the decision of the case of Davies v. Mann, 10 M. & W. 545.
“ The plaintiff having fettered the fore feet of an ass belonging to him, turned it into a public highway; and at the time in question, the ass was grazing on the off side of a road about eight yards wide, when the defendant’s wagon, with a team of three hoi’ses, coming down a slight descent, at what the witness termed a 1 smartish pace,’ ran against the ass, knocked it down, and the wheels passing over it, it died soon after. The ass was fettered at the time, and it was proved that the driver of the wagon was some little distance behind the horses. The learned judge (Erskine, before whom the case was tried at the Worcester assizes), told the jury, that ‘though the act of the plaintiff, in leaving the donkey on the highway, so fettered as to prevent his getting out of the way of carriages traveling along it, might be illegal; still, if the proximate cause of the injury was attributable to the want of proper conduct on the part of the driver of the wagon, the action was main, tainable against the defendant; ’ and his lordship directed them, if they thought the accident might have been avoided by the exercise of ordinary care on the part of the driver, to find for the plaintiff.”
195] * After a verdict for the plaintiff, on a motion for a new trial, which came before the exchequer, Lord Abinger said:
*196 “ I am of opinion that there ought to be no rule in this ease. The defendant has not denied that the ass was lawfully in the highway, and therefore we must assume it to have been lawfully there. But even were it otherwise, it would have made no difference; for, as the defendant might, by the exercise of proper care, have avoided injuring the animal, and did not, he is liable for the consequences of his negligence, though the animal may have been improperly there.”
The Supreme Court of Vermont, in the case of Trow v. The Vermont Central Railroad Co., 24 Vt. 488, in which this doctrine is fully sustained, said: “ When the negligence of the defendant is proximate, and that of the plaintiff remote, the action can then well be sustained, although the plaintiff is not entirely without fault. This seems to be now settled in England and in this country. Therefore, if there be negligence on the part of the plaintiff, yet, if, at the time when the injury was committed, it might have been avoided by the defendant in the exercise of reasonable care and prudence, an action will lie for the -injury. So, in this case, if the plaintiff were guilty of negligence, or even of positive wrong, in placing his horse in the highway, the defendants were bound to the exercise of reasonable care and diligence in the use of their road, and management of the engine and train, and if, for want of that care, the injury arose, they are liable.”
From a review of the decisions on this subject, both in England and in this country, the following conclusion appears fairly deducible:
That the general rule is, that where the parties are mutually in fault, or in other words, where negligence of the same nature, in each party, has co-operated to produce the injury, the party sustaining the loss is without remedy; but that this rule is subject to the following qualifications:
1. The injured party, although in the fault to some ^extent, [196 at the same time may, notwithstanding this, be entitled to reparation in damages for an injury, which could not have been avoided by ordinary care on his part.
2. When the negligence of the defendant in a suit upon such ground of action is the proximate cause of the injury, but that of the plaintiff only remote, consisting of some act or omission, not occurring at the time of the injury, the action for reparation is maintainable.
*197 3. Where a party has in his custody or control dangerous implements-,. or means of injury, and negligently uses them-, or places them in a situation unsafe to others, and another person, although at the- time even in the commission of a trespass-, or otherwise somewhat in the wrong, sustains- an injury, he may be entitled to redress.
4. And where the plaintiff, in the ordinary exercise of his own rights, allows his property to be in an exposed and hazardous position, and it becomes injured by the neglect of ordinary care and caution on the part- of the defendant, he is entitled to reparation for the reason that, although by allowing his property to be exposed to danger, he took upon himself the risk of loss or injury by mere accident, he did not thereby discharge the defendant from the duty of observing ordinary care and prudence, or in other words voluntarily incur the risk of injury by the negligence of another.
The application of these rules, which- appear reasonable and just, removes all difficulty in the disposition of the case before us. The act of the plaintiff allowing his hogs to be at large in the neighborhood- of the railroad, where they were exposed to the danger of getting upon the railway track and being injured, was only a remote cause of the- injury; and in the voluntary exposure of his property to danger in the exercise of his lawful rights; he' took upon himself the risk of injury to his property by mere accident, but not the risk of injury by the defendant’s- negligence. And the defendant was chargeable with some degree of negligence by the omission to have its railroad inclosed by suitable fences and cattle-guards. On this subr 197] ject,the Supreme Court of Vermont, *in the ease of Trown. The Vermont Central R. R. Co., before mentioned, say: “ The duty of maintaining fences and erecting cattle-guards for such purposes is imposed on the corporation not only as a matter of safety in the use of their road and running their engines thereon, but also as a matter of security to the property- of those living near and contiguous to the road. And this arises from the consideration that they must know,, and reasonably expect, that without such precautions such injuries will naturally and frequently arise. And when, for the distance mentioned in this case, no precautions of that kind were used upon this road, and in a place so public and common, we think, as a matter of law, there was that neglect which will render the corporation liable for injuries arising solely from that cause.”
This is in accordance with the decision of the same court in the case, Quimby v. The Vermont Central R. R. Co., 23 Vt. 388, in *198 •which it was held: “ That although the charter of the company made no provision in reference to the obligation to maintain fences upon the line of the road, the general law of the state, in reference to- the obligation of adjoining land-owners to maintain the division fences between them, did not apply, but that the obligation to maintain the fences rested primarily upon the company, and until tb.ev have either built the fences, or paid the land-owner for doing it, a sufficient length of time, to enable him to do it, the mere fact that cattle g.et upon the road from the land adjoining, is no. ground for imputing negligence to the owners of the cattle.” So, also, the case of The Matter of the Rensselaer & Saratoga R. R. Co., 14 Paige, 553.
It being the right of the owners, of animals in this state to let them be at large, it follows that the mere fact of' allowing them to be at large,, generally, can not be a ground of imputing negligence to'the owner. But when the owner allows them -to be at large in the immediate vicinity of an uninclosed railroad, where they will be liable to wander upon the railroad, he can not be said to exercise that high degree of care and prudence in reference to his own interests which *men of more than ordinary care and caution [198 take of their own property. And admitting the plaintiff, in this case, to have been chargeable in some degree with negligence in this respect, yet the defendant was certainly chargeable with negligence, in at least an equal degree, for want of proper care in inclosing its railroad with fences and cattle-guards. The construction of the railroad could not abridge or take away the existing right of persons to allow their animals to. be at large,, although the danger which it created may have enjoined more care and prudence on the owners of animals in letting them be at large in the immediate neighborhood of the road. But the company having constructed its road through a country where it was well known that domestic animals were suffered to run .at large, and where the custom and right in this respect must be unquestionable, the consideration of the inevitable exposure of the road while uninelosed to such casualties and injuries, as that- of animals running at large, getting upon it, enjoined upon the company, in the exercise of at least some degree of care and caution, the duty of inclosing the road. And, by the omission of this, the defendant was, at least, as much in fault, and at least as much chargeable with negligence as the plaintiff. And in each case, that is, in allowing the animals to be at large by the plaintiff, and in leaving the railroad uninclosed *199 by the defendant, the negligence was remote, each only remotely or consequentially contributing to cause the injury. If there had existed no other negligence than this, on either side, and the loss had occurred from unavoidable accident in running the train upon the hogs, when the agents of the company were in the full exercise of due care and caution in the discharge of their duty,-the plaintiff would probably have been without redress. The turning point of ' this case, therefore, as presented, would seem to be, not whether there was negligence on the part of the plaintiff in allowing his hogs to be at large, or negligence on the part of the defendant in omitting to inclose its road by fences and cattle-guards, but whether 199] the agents of the defendant at the time *of the occurrence exercised reasonable and ordinary care to avoid the injury. Having left its road uninclosed, and exposed to the intrusion of the animals at large coming upon the track, it was the duty of the company, acting through its agents, to use ordinary and reasonable care and diligence to avoid all unnecessary injury to the animals found accidentally in the way of its train upon the road.
What amounts to ordinary care on the part of the agents of the company, depends on the peculiar nature of the employment, and the circumstances attending the transaction. The defendant’s agents were engaged in the management of powerful and dangerous machinery, moving with great rapidity, to the skillful and safe conduct of which is intrusted not merely property, but the safety of human beings to a large extent. The first and paramount object of the attention of the agents of the company is a proper regard for the safety of the persons and property in their charge on the train. The plaintiff had no right to expect his property, under the circumstances, to be protected, unless it could be done consistently with the higher obligations and responsibilities resting on the agent of the defendant. In this particular employment a higher degree of skill and diligence is exacted of the persons engaged than that which is requisite in the ordinary pursuits of life. For the protection of the persons and property of individuals in charge of the agents of the defendant on the train of cars, the company was hold to a high degree of care and diligence; and with a due regard to this paramount duty they were bound to the exercise of what, in that peculiar employment, would be ordinary and reasonable care to avoid doing any unnecessary injury to the property of the *200, 201 plaintiff which happened, accidentally, to be upon the railway track.
The court of common pleas, however, in this case refused, upon request, to charge the jury that the agents of the defendant were held to the exercise of ordinary care and caution to avoid injury to the plaintiff’s property thus upon the railroad ; but on the contrary charged that the hogs, being unlawfully *on the road, the de- [200 fendant’s agents were not required to check the speed of the train and avoid injury to the animals, even if they could easily and readily have done so.
This ruling of the court of common pleas is in direct conflict with the doctrine of Lord Ellenborough, in the case of Yere v. Cawdor, in which he said: “That the idea that the plaintiff’s dog had incurred the penalty of death by running after a hare on another's ground, outrages all reason and sense; ” in conflict with the doctrine that even in case of a trespass, no unnecessary and excessive violence shall be used to the injury of another, a principle which Dallas, J., said “ pervades every part of the law of England, criminal as well as civil, and indeed, belongs to all laws that are founded on reason and natural equity;” contrary to the humane spirit of our laws against cruelty to animals; contrary to the doctrine that a man, in the exercise of his lawful rights, shall use reasonable and ordinary care to avoid injury to another; and contrary to the whole course of adjudication in England and in this country generally, on mere questions of negligence.
But it is due to the court below to say that its charge to the jury was in strict accordance with the decisions in New York, Pennsylvania, and perhaps those of several other states, in cases of suits against railroad companies upon grounds similar to that for which this suit was brought. But the decisions in those states all rest upon the ground that it is unlawful for the owners of domestic animals to allow them to be at large; and that when they are at large, and happen to stray upon a railroad, the persons in charge of trains on it are absolved from the duty of using care to avoid unnecessary injury to them. It has been shown that this doctrine has no application in this state; those decisions, therefore, are of no authority here. We recognize the maxim, sic utere tuo ut alienum non Icedas, as a principle founded in justice, and essential to the peace, order, and well-heing of the community, as applicable to the enjoyment of all , property, and the exercise of all rights '^incident thereto; to [201 *202 the protection of which the weakest are entitled, and from- the observance of which the most powerful are not exempt.
For the error in the charge of the court below to the jury, the judgment is reversed, and the cause remanded for further proceedings.