## Samuel P. Brady v. The North Western Insurance Company.

Each renewal of a policy of insurance is a new contract, and is subject to the local laws in force at the time of the renewal.

So held where a policy of insurance of a wood building against fire was made in 1856, and renewed from year to year until 1861, and between its date and the last renewal city ordinances had been adopted, prohibiting the reconstruction or repair of wood buildings within certain limits, including the building insured.

A policy of insurance against fire covers all loss which necessarily follows from the occurrence of a fire, whenever the injury arises directly or immediately from the peril, or necessarily from incidental and surrounding circumstances the operation and influence of which could not be avoided.

A wooden building situated within the fire limits of Detroit was injured by fire, and by the ordinances of that city could not be repaired without the consent of the Common Council. This consent was refused. The building was insured for $2,000, and the policy contained a clause that in case of loss or damage to the property it should be optional with the company to rebuild or repair the building within a reasonable time. The cost of repairing the building would be much less than the amount of the insurance, but without leave to repair, the building, which before the fire was worth $4,000, would now be worth less than $100. It was held that the insured was entitled to recover the whole insurance, and was not limited to such sum as would cover the cost of repair.

The Common Council of Detroit has power to pass ordinances establishing fire limits, and forbidding the rebuilding or repair of wood buildings within such limits.

11 MICH.—2 B.

BRADY *v.* THE NORTHWESTERN INSURANCE CO.

Such an ordinance is not to be regarded as a condemnation to the public use of such buildings as have become worthless unless repaired.

*Heard April 23th and 24th. Decided May 30th.*

Error to Oakland Circuit.

The action was brought by Brady upon a policy of insurance for $2,000, issued January 1, 1856, for one year, and renewed annually thereafter, the last renewal being January 1, 1861. The policy covered a three-story wood warehouse owned by Brady, in the city of Detroit. Among the conditions of insurance inserted in the policy was the following:

" X. In case of any loss or damage to the property insured, it shall be optional with the company to replace the articles lost or damaged with others of the same kind and equal goodness, and to rebuild or repair the building or buildings within a reasonable time, giving notice of their intention so to do within forty days after having received the preliminary proofs of loss required by the third and ninth articles of these conditions, and where no such offer to replace, rebuild or repair is made, the loss due and ascertained shall be payable in sixty days after receiving such proofs and papers as are required by said third and ninth articles."

On the trial it was proved on behalf of the plaintiff, that the warehouse took fire February 1, 1861, and the roof was entirely burned. The building before the fire was worth from $4,000 to $5,000, and the unconsumed portion was now worth less than $100.

The plaintiff then proposed to refer to the charter of the city of Detroit, for the years 1855, and 1857; and offered in evidence section one of chapter 130, of the ordinances of the Common Council of the city of Detroit, approved February 15th, 1849, as tending to show that the warehouse in question when insured was, and ever since has been within the fire limits of the city of Detroit, as established by said section one of said ordinances; and'

as tending to show that at the time of .the making and renewal of said policy of insurance, and ever since, the ordinances of the Common Council prohibited the rebuilding without special leave of the Common Council of any wooden building partially destroyed by fire within said fire limits, he offered in evidence the following parts of said ordinances of said city: section 1, in said chapter 130, of the ordinances above referred to, which is in the words following:

"No person shall hereafter erect or place any building or any part of a building within the following limits, unless such building or part of building shall be constructed of stone or brick, ·with party or fire walls of the same material rising at least ten inches above the roof, if the same be covered with metal or slate, if with wood, then at least two feet, viz,"—here follows a description of fire limits, mentioning the ground covered .by the insured premises: and also section 4, viz: "No person shall raise or elevate from the ground any wooden building now standing within said limits, by constructing thereunder or thereon another story, or in any other way increase the height of said building, and if any person shall violate the provisions of this section, then he shall forfeit a penalty of fifty dollars, and also a penalty of fifty dollars for each and every week said building shall remain so raised or erected." Also section one, of chapter 39; and section four, of chapter 39, of the ordinances of the Common Council, approved August 15th, 1855, which said section one established fire limits, embracing the warehouse in question, and which said section four was the same in every respect as section four of the ordinances of 1849, previously above quoted. Also sections one and four, of chapter 38, of the ordinances of the Common Council of said city, approved October 1st, 1859, which said section one established fire¹ limits, ˮ embracing the warehouse in question, and which said section four was as follows:

"No person shall repair any wooden building partially destroyed by fire, nor raise or elevate from the ground any wooden building now standing within said limits (fire limits as established by section 1), by constructing thereunder or thereon another story or part of a story, or in any other way increase the height of said buildings, unless he shall have previously obtained permission from the Common Council to do so, and in no case where the proposed repairs or alterations will increase the fire risk shall such permission be granted, and if any person shall violate the provisions of this section, then he shall forfeit a penalty of fifty dollars for each and every week said building shall remain so raised or erected." To all which and each of which said city ordinances, so sought to be introduced in evidence, the defendants objected, that the ordinances of the Common Council, and their proceedings thereunder could have nothing to do with the measure or rule of damages applicable to the contract of the parties, and that the same were wholly irrelevant to the issue between them. The objection thus taken was sustained by the Court, and the plaintiff excepted.

The plaintiff at the same time, and in connection with the offer to introduce said ordinances in evidence, likewise offered in evidence the duly authenticated proceedings of the said Common Council which were had on the 12th and 19th of February, 1861, tending to show that the plaintiff had applied to said Common Council for permission to repair said warehouse, and at the suggestion of J. L. Whiting, the agent of the said defendants residing in the city of Detroit, and that the said Council had denied said plaintiff's request, which testimony was objected to by the defendants for the same reasons as were urged against the admission of the city ordinances, and the objections having been sustained by the Court, the plaintiff excepted.

The plaintiff admitted in open court the payment to

him of the sum of $866 50 by the defendants, to apply upon the amount of his damage or loss under the policy, and conceded that another insurance company was respon-sible for one-half of the entire amount of his damages and thereupon rested.

The defendants then called several witnesses, who were sworn, and testified what sum in their judgment was neces-sary to restore the building to the condition it was in immediately preceding the fire, and then rested.

The Court charged the jury that the rule of damages in the cause was, that the plaintiff should recover such amount as was sufficient to repair the warehouse, and place it in as good condition as it was in at the time when the loss or damage by fire happened, and that a jury could find for the plaintiff only such damage as they were satis-fied would be sufficient to have so repaired the premises. That as the plaintiff admitted he had received $866 50 from the defendants, and as it was conceded that another insurance company was responsible for one-half of such damages, the jury could only find for the plaintiff for one-half of any additional amount they might from the testimony believe to have been necessary or sufficient for the repairing of the premises insured. The plaintiff excepted to that portion of the charge which instructed the jury that the proper measure of damages was such amount as would be sufficient to rebuild or repair said building.

The defendants having recovered judgment, plaintiff brought error.

*G. V. N. Lothrop* and *S. D. Miller*, for plaintiff in error:

The contract of insurance is largely speculative. The grounds upon which the insurer enters into his agreement are necessarily uncertain. He weighs the facts before him in estimating the probabilities of profit or loss.

Not only the physical, but the moral and legal aspects of these facts, are essential to such an estimate; and must

be assumed to have entered into his consideration. He regulates his contract by them. Not only does he have reference to the material, and the mode of construction, and the mere locality of the thing to be insured, and the uses to which it may be put; of vital consequence to his risk is the state of the community, its character, its police regulations (affording greater or less facilities for the control of the element insured against), and such other surroundings as of necessity have an influence quite as great as the merely physical condition of the property.

He limits the extent of his liability with an intelligent reference to the value of the property. He ascertains that value not merely from an estimate of the price of the material used in the construction of the thing which is the subject of the risk: he regards, also, its locality and the uses to which it may be put; and he considers, also, in this estimation, such moral and legal conditions as are intimately connected with the property and necessarily enhance, or subtract from, the intrinsic value.

The contract is one of indemnity. Its purpose is to secure the insured against such loss as may happen by fire to his property.

The contract "is to be construed largely for the benefit of trade and for the insured." *Pell v. Royal Exch. Ins. Co.*, 1 *Burr.* 341.

The parties must be assumed to have in view local laws, particular usages, and exceptional courses of trade incident to the individual risk. Without discussing the question of proximate and remote causes, a review of the cases will show that the insurer has always been held liable for the full amount of the actual injury to the subject of the risk, whether that injury arose directly and immediately from the peril, or necessarily from incidental and surrounding causes or circumstances, the operation and influence of which could not be avoided. *Magoun v. N. E. Ins. Co.*, 1 *Story*, 157; *Hale v. Wash. Ins. Co.*, 2 *Story*, 176; *Peters*

*v. Warren Ins. Co.,* 3 *Sumn.* 386; *Columbian Ins. Co. v. Catlett,* 12 *Wheat.* 383; *Peters v. Warren Ins. Co.,* 14 *Pet.* 99; *Henderson v. West. Fire Ins. Co.,* 10 *Rob.* 164; *Nelson v. Suffolk Ins. Co.,* 8 *Cush.* 477; *Fire Ins. Co. v. Corlies,* 21 *Wend.* 367; *Case v. Hartford Ins. Co.,* 13 *Ill.* 676; *Waters v. Merch. Ins. Co.,* 11 *Pet.* 218; *Columbia Ins. Co. v. Lawrence,* 10 *Pet.* 507; *Laurent v. Chatham Fire Ins. Co.* 1 *Hall,* 41; *Tilton v. Hamilton Ins. Co.,* 1 *Bosw.* 367.

In the present case it is claimed:

*First,* That the peril insured against — fire — was, within the meaning of the contract, the sole cause of the entire injury.

Fire was the original agent — the *causa sine qua non* — in producing the injury. The local law was not in any true sense the *cause* of the injury. It was a part of the general *status* of things, and had its influence in enhancing the amount of the loss, but it was not an active power moving towards the result.

The cases conclusively show that *fire alone* need not be the efficient agent or instrumentality, in order to bring the loss within the meaning of the policy. They also show that whenever the peril necessarily attaches to the loss actually happening to the thing insured, an additional loss to the insured, which becomes fastened upon the subject of insurance, there the peril is in fact the cause of the loss.

The declaration alleges a loss by fire. It was not necessary, in order to sustain the action, that we should prove any other fact as the cause of the loss.

The testimony in reference to the local law was offered solely to show the actual damages which, under the unavoidable circumstances of the case, were the necessary result of the fire.

*Second,* The necessary proximate damage to the plaintiff was the difference between the value of the warehouse

immediately prior to the fire, and the value of the material remaining after the fire, considered solely with reference to the uses to which such material could legally be appropriated.

The contract was not simply an agreement to pay for so much material as might be damaged by fire,— to pay such amount as the material might actually be worth. Fixed by the conditions of the policy as the most hazardous of all structures, and with a premium adjusted accordingly, the insurer took the risk upon a "three-story wood warehouse," actually in use as such. The risk was not taken upon a mere collection of beams, boards and other materials, thrown together without purpose or special adaptation. It was upon a building for trade, situated in a particular locality, within the jurisdiction of municipal authorities vested with legislative powers for special purposes, subject to the exercise of those powers: the value of the building and the value of the material thereof largely dependent upon such legislation; the uses to which they could be put largely under the control of the legal discretion thus vested.

This discretion included authority not only to prevent the recurrence of fires, but to provide such facilities as would quickly subdue them and prevent the destruction of buildings otherwise certainly lost.

The parties must be regarded as contracting with a full knowledge of and reference to these facts. The contract was made here, in respect to property having permanent and definite locality here, and it was to be performed here.

The terms of the policy provided that "Insurance might be continued for such further time as should be agreed on." But the original agreement expired with the year, and each subsequent renewal constituted a new contract. The policy was "continued in force," subject to the law existing at the time this contract was made,

and that law must be regarded as entering into the views of the parties so contracting.

Even local customs are permitted to govern and construe contracts, and local laws, which were contrary to the general law, have been held to modify and control contracts of this character.

The law of the municipality is as supreme within its jurisdiction as the statute of the State.

The real value of the building as a warehouse, depended upon "its utility, its power or capacity of producing good." It did not depend simply upon the market price of the component parts.

Then, is not the law in force which determines its utility,— the purposes to which it can be applied,—of consequence, in ascertaining the value?

The law says that the materials which remained after the fire cannot be used in reconstructing a warehouse upon the same ground.

Clearly, as a practical question of value, the law must have an influence, and the actual damages to the plaintiff must be conceded to be the difference between the worth of the building prior to the fire, and the worth (under the law) of the parts thereof remaining after the fire.

*D. B. Duffield,* for defendants in error:

The hinge of this case turns on a settlement of the question what is its rule of damages? In order to ascertain this, the agreement between the parties must first be settled, for that "as a general rule controls the measure of renumeration." *Sedg. on Dams.* pp. 214, 215.

Parties have a right to make such contracts as they please, and when made they must govern:—7 *Casey,* 448; 5 *Ib.* 198. If insuring parties do not settle their contracts precisely as they are, they have no one to blame but themselves:—*Langhorn v. Hardy,* 4 *Taunt.* 631.

There being a contract here, the first inquiry is, of what sort is the contract?

The plaintiff seeks to introduce a city ordinance and the action of the Common Council as a part of it, and the defendant objects on the ground of its irrelevancy to the issue; it forming no part of the contract.

The validity of this objection will appear from the following among other reasons: 1st, The printed contract evidenced in the policy, is the only contract between the parties declared on, and that excludes all reference to city ordinances in any form. The contract is either express, that is, standing on written evidence, implied—raised only by implication—or mixed, that is, partly express and partly implied: under one or other of these heads, which exhaust all possibilities of contract, this one must fall.

Neither plaintiff nor defendant claim it to be purely an implied one; is it a mixed one, composed in part of the printed and written policy, and in part of the city ordinance?

It is admitted that it is a lawful contract, and that both parties had knowledge of all existing legal provisions rightly affecting it; but the defendant's knowledge of this ordinance did not make it part of his contract, and especially if this ordinance did not exist at the date of the policy it could not form a part of it. The defendant's hypothesis is, that this is an express contract, resting upon the policy alone, untouched by the city ordinance, and establishing by its own terms the rule of damage. In support of this view, while searching for the rule of damages, the ordinance is to be treated as though it was not, because, its provisions can have no possible application to the case for determining the rule of damages. This is fixed by the terms of the policy itself, as we shall hereafter see.

I. This contract then takes up and makes part of it the "conditions" annexed: — *Ang. on Fire Ins. p. 53,*

*cases cited.* Each and every part of the policy is valid to determine the meaning of every other part.

II. It determines upon what the risk is taken; and the amount to which the insurer may become liable; viz: to $2,000, should the damage reach that figure, "on plaintiff's three story wood warehouse, and additions thereto occupied as a storage, forwarding and provision store," &c.

A building suitable for certain purposes, therefore, was insured, and the risk to that from fire, was the single risk the plaintiff sought to lay on the defendant by this contract. The language is, "all such loss or damage, not exceeding in amount the sum insured, as shall happen by fire to the property as above specified"; it is this and only this, which the company assumes to indemnify against: "the property insured," "on the said property," capable of being "repaired," "for such ratable proportion of the loss or damage happening to the subject insured," are expressions running all through the contract. "The subject insured:" there is a material subject and not something else, and loss and damage by fire to that is what the company is to assume and carry. It is not putting the party in as good condition as he was in before. It means simply repayment of as much of the insured subject as is lost:— 1 *Phil. on Ins.* §§ 3, 120; *Irving v. Mundy*, 2 *M. G. & S.* 784.

Here arises a distinction between loss to the subject insured, and loss to the person insured; the latter is rarely coincident with the former, and falls on him alone, simply because the underwriter has not agreed to indemnify him against it.

They are separate interests," say the Courts, and he might have had them insured. Evidently they do not attach to nor inhere in the building so as to be carried by the building,—in the one case the damage is material, in the other personal. The inquiry never is, "what the loss of the insured?" but "what loss did the

company undertake to make good?" *Langhorn v. Hardy*, 4 *Taunt.* "The risks for which indemnity is promised must be specified." 1 *Phil. on Ins., p.* 27. A person may be insured against the consequences of a violation of a municipal law. 2 *Phil. on Ins.*, 908. Numerous cases may be cited to illustrate this distinction. But we need not suppose cases in order to reach the meaning of the words "loss to the subject insured," &c. In the case of *Laurent v. Chatham Fire Ins. Co.*, 1 *Hall*, 41, it is held that it is not the actual loss to the insured, but the loss which the *words of the contract legally cover*, that shall measure the underwriter's liability. The contract must be construed according to its words, and not according to any pretended equities which would only introduce uncertainty. 2 *Phil. on Ins.*, § 120; 2 *Ibid*, § 258.

In *Niblo v. N. A. Ins. Co.*, 1 *Sandf.* 283, the same doctrine with that in 1 *Hall Rep.*, is repeated, and the former case affirmed. Vide, also, 3 *Nev. & Man. R.* 819; 1 *A. & E.*, 621; 3 *Barr*, 470.

Again, the principle involved in the case of consignees or factors insuring, shows that it is not the personal interest of the party insured that is indemnified against, but it is the loss or damage to the subject insured. *DeForest v. Fulton Fire Ins. Co.*, 1 *Hall*, 116; *Ang. on Fire Ins.*, §§ 73, 264.

If their "rents," "income," "profits," &c., are detached interests, not carried by the property, by parity of reasoning any prospective disabilities not morally certain, and contingent on a fire which may not happen at all, are *a fortiori detached*, and not attached interests, and cannot be made to swell the claim against the insurer: they must be insured separately. It is in this catagory we place the alleged loss growing out of city ordinances.

III. A third particular of the contract is the source from which the loss must come which the underwriters agree to make good, viz: *loss by fire*—not loss by city

ordinances, although they should make up and attach on the property the instant after the fire occurred. Under the cases cited, they must have inhered in the building before or at the time of the fire; for by reference to the policy we find "the loss or damage is to be estimated according to the true and actual cash value of the said property at the time said loss or damage shall happen."

The words "at the time," mean one of three things:

1st. *After* the fire, when all is ashes.

2d. While the fire is raging and the value momentarily changing; or,

3d. *Just prior to* its destruction, when it was valuable for the purposes specified in the policy. The words mean the last or nothing; for then fire upon the building was all a contingency, and prohibition of repairs under city ordinances in consequence of such fire, a still more remote contingency, affecting the mind of a purchaser but little, if at all. The point is that these ordinance disabilities have not attached at the time the valuation is to be made, and are no part of "the subject insured." They did not attach until after petition and action thereon, and refusal by the Council for leave to repair, and of course they could not exist at the time immediately preceding the fire, and therefore could not be estimated. 5 *Barr*, 183; 1 *La. An. Rep.* 216; 29 *Penn.* 198; 31 *Penn.* 448; 37 *Penn.* 205.

Again, the provisions of the ordinance and the possible action of the Council are so contingent and uncertain that they could not have been recognized by the parties as covered by the contract. This is susceptible of abundant illustration.

IV. It will aid the search after the true rule of damage by examining what the contract is *not*.

1. It is not a general contract of indemnity, but one to indemnify in the manner and to the extent stated in it.

2. It is not a contract to rebuild or repair in case of complete or partial destruction. The company has the privilege to do so—if it chooses. *Ang. on Fire Ins.* § 269.

But one of the fundamental fallacies of the plaintiff's case is, that he seeks to convert this election into a legal obligation upon the company. This he can not do, as was settled judicially in the case of *Com. Ins. Co. v. Gennett*, 37 *Penn. St.* 205.

The argument thus based falls to the ground, for the company can only be held as it *elects*.

A second fallacy of the plaintiff is, that what a man is *not* bound to do, shall be the gage and measure of something else which he *is* bound to do! That is, that the cost of repairing (involving here a total loss) which defendant is *not* bound to do, shall be the rule of damage for what he *is* bound to do, viz: to pay the actual value of the damage done by the fire to the subject insured. This fallacy, if adopted as a rule, would introduce an element of conflict into the contract itself which we have seen provides its own rule of damages. *Vide* 2 *Greenl. Ev.* § 407.

Returning, then, to the question of whether this is a *mixed* contract of policy and ordinance, we find that it does not concern us if the plaintiff does hold it to be such; for we have shown that the provisions of the ordinance cannot reach the defendant, inasmuch as when ("at the time") the property was in such condition that its cash value could be taken in pursuance of the contract, these disabilities imposed on the property owner were yet in the future, detached and altogether contingent, and could not enter into the computation of damages, which "are to be estimated according to the cash value of the property *at the time* the loss happened."

"The best construction of a contract," says Ch. Justice Gibson, "is made by viewing the subject of it as the mass of mankind would view it." *Schuylkill Nav. Co. v. Moore*, 2 *Whart.* 491.

V. But supposing plaintiff's position conceded, there appears this clause further in the policy: "This insurance (the risk not being changed) may be continued for such further term as shall be agreed on," &c.

The ordinances in force at the date of the contract regulating fire limits, and the re-erection and repair of buildings, do not operate to prevent the repair of this building had it then have been partially burned. But the ordinance here sought to be forced into our contract, was passed some four or five years after the date of the contract. If, therefore, any ordinance composed part of the defendants' contract, it was the one in existence at its date; and under the clause above quoted, the latter one could not be applied, because it did materially "change the risk."

VI. It is further insisted that this ordinance is unreasonable in its character; and inasmuch as it subjects the right to hold, use and enjoy property as guaranteed by the Constitution, to the mere caprice or discretion of a shifting body like the Common Council, it is also unconstitutional and void. Had the ordinance provided for compensation by jury to the owner of property thus situated and ordered to be destroyed, it might, perhaps, have been held constitutional, but not doing this, it cannot stand.

The plaintiff contends that the fire here was the efficient cause of the loss, and the ordinance merely the incidental cause, and that the latter is included in the former, which is the proximate cause; and he relies on the case of *The Paragon*, 14 *Pet.* 99.

But this case, so far as its doctrine is applicable to the case at bar, is substantially overruled in *The Gen. Mut. Ins. Co. v. Sherwood*, 14 *How.* 360; and in *Mathews v. Howard Ins. Co.*, 1 *Kern.* 9.

I think that it is therefore clear, that the personal loss of the plaintiff was the result of two different agencies or causes, viz:

1st. That produced by the fire upon the building to the extent admitted by the defendant; and,

2d. The destruction of the remainder of the building by order of the Common Council prohibiting its repair.

There is no necessary or direct connection between these two causes—they are not inter-dependent, as the fire could occasion its loss without necessarily producing a loss under the ordinance. They were capable of being severally insured against, and no adroit use of those vague expressions of "proximate" and "incidental" cause, can disturb this fact of the total loss being the result of two independent causes.

The plaintiff has mistaken his remedy in seeking his defense against this unreasonable and unconstitutional ordinance. He should not have pulled down his building without testing his constitutional rights in reference thereto. Having so done, he may have lost his remedy, but whether he has or not, he cannot find it in our contract, which furnishes and settles its own rule of damages, and the Court cannot go outside of it and adopt any other.

*H. K. Clarke* on the same side:

1. Insurers against fire are liable only for such damage as the property has suffered,—not for that which the owner may have suffered in consequence of the fire. 1 *Hall*, 41; 1 *Sandf. S. C.* 551; 3 *Seld.* 583; 1 *A. & E.* 621; 2 *Greenl. Ev.* § 407; *Ang. on Ins.* § 269.

2. Insurers against fire are liable only for losses of which fire is the proximate cause. 6 *Taunt.* 436; 6 *Barb.* 637; 3 *Barr*, 470; 1 *Sumn.* 218; 8 *Pet.* 557; 14 *N. H.* 341; *Ang. on Ins.* §§ 111-114, 119, 120.

3. That cannot be the proximate cause of an injury which inflicts none of itself, and is only connected with the injury by proving other facts of an essentially different nature. 1 *Kern.* 9.

4. The Common Council cannot so exercise the powers conferred by the charter, to prevent the repairing or re-building of wooden buildings damaged by fire, as to

deprive a person of his property without [making compensation. *Const. of Mich.*, *Art.* 18, §§ 14 *and* 2; *Art.* 15 § 15; 2 *Kent*, 340.

The acts of the Council sought to be proved were not acts of mere regulation, such as prescribing what sort of buildings should be erected within a given district, but they involved an actual taking of property of which the owner was deprived to the extent of $2,500.

Police powers never authorize the taking of property that is not of itself a nuisance, except perhaps in the actual presence of an immediate peril.

5. A destruction of private property to promote public improvement, is a taking, within the constitutional prohibition. 6 *Cow.* 518; 13 *Wend.* 355; 2 *Stock.* 211; 1 *Zab.* 714.

The maxim which has been held to justify the taking of property in the presence of an immediate and over-whelming necessity, "*Salus populi est suprema lex*," does not apply here. It would protect a public officer, and indeed a private citizen from personal liability in consequence of ordering or engaging in the destruction of a building in the presence of any such necessity. But the same cases which affirm this, affirm also the right of compensation from the public. 4 *T. R.* 794; 17 *Wend.* 285; 18 *Wend.* 126.

If the Court declare that the tearing down a building to stop a conflagration entitles the owner of the building to compensation from the public, how much clearer is the case that the owner cannot be compelled, without compensation, to tear down his building in order to render a given district in a city prospectively more safe?

It is true that the Council do not assume the power to compel the removal of the building; this might promote the public safety. They simply forbid repairs, and thus by leaving the building in its damaged state they increase the public danger.

11 MICH.—2 C.

But if it be conceded that the Common Council of Detroit had authority to pass the ordinance which was offered in evidence, how does this evidence become relevant to the issue in this case?

The plaintiff replies by asserting that the local law enters into, and forms part of every contract made within its jurisdiction; and cites the case of the *Paragon, Peters v. The Warren Ins. Co.*, 14 *Pet.* 99.

The doctrine of this case is contradicted by 4 *A. & E.* 420; 1 *Kern.* 9; 12 *Rich.* 13; and is substantially over-ruled by *General Mut. Ins. Co. v. Sherwood*, 14 *How.* 351.

A fire policy is construed with much closer reference to the actual import of the words employed to express the undertaking of the insurers than a marine policy. Compare 1 *Arnould*, 28, *with* 1 *Sandf. S. C.* 557.

6. The law never overcomes by its implications the express provisions of the parties. 2 *Pars. on Con.* 27.

"The general ground of a legal implication is that the parties would have expressed that which the law implies, had they thought of it." To make this implication in this case, the Court must be satisfied that the insurers, "had they thought of it," would have made themselves responsible, for every partial loss, as a total loss, if in the judgment of a city council the city would be improved thereby.

But whatever reason there may be for asserting that a local law becomes part of every contract executed within its jurisdiction, certainly it does not follow that the discretionary power vested by law in public bodies also inheres in all such contracts, and that the construction of the contract will depend upon the exercise of that discretion.

7. The insurers are entitled to have the provisions of the contract which were 'intended for their benefit so construed as to effect that object.

By one of the special conditions on which the policy

in this case was issued, it is made "the duty of the insured to use their best endeavors for saving and preserving the property." This is for the benefit of the insurers; a benefit which the insured by the contract concedes. But of what benefit will it be if, notwithstanding the saving of the property from the fire, they are nevertheless obliged to pay for it as if it were completely destroyed? Under such circumstances, by force of the ordinance if it be a part of the contract, as the plaintiff alleges, property saved is the same in effect as property destroyed. And this the Court is asked to believe *was the intention of the parties!*

*S. T. Douglass*, on same side.

MARTIN CH. J.:

The plaintiff in this case was insured by the defendants in the sum of two thousand dollars, upon his warehouse, on the first day of January, 1856, for one year. The policy of insurance contained, among others, this provision: "This insurance (the risk not being changed) may be continued for such further time as shall be agreed on; the premium therefor being paid and indorsed on this policy, or a receipt given for the same." The obligation of the defendants seems to have been renewed every succeeding year, under this stipulation; and upon such renewed obligation, dating from the first day of January, 1861, this action arises.

Between the years 1856 and 1861, certain ordinances were adopted by the Common Council of Detroit, for preventing the restoration or reconstruction, within certain boundaries, of wood buildings which might be injured or destroyed by fire. After the passing of these ordinances, the policy was renewed on payment of the premium originally stipulated, and after being countersigned by the resident agent. The question now presented is, whether

the liability of the defendant is under the promise of 1856 or that of 1861; in other words, was the undertaking of 1856 made a continuous undertaking, to be construed by the laws and ordinances as they existed in 1856 solely, or, by the renewal, were the parties bound by the laws and ordinances existing at the time of such renewal.

We have no doubt that each renewal of the policy was a new contract. Each was upon a new consideration, and was optional with both parties. At the expiration of the year over which the original policy extended, the obligation of the insurer was ended, and it was only by the concurrence of the will of both parties that the obligation could be continued. This concurrence is manifested by the payment of a consideration by the one party, and a renewed promise by the other; and an obligation revived or continued under such circumstances, is an original obligation. It must be asked for by the one, and may be assumed or refused by the other; and the policy, which is its evidence, is therefore only continued by the positive act of both parties. This is according to the terms of the policy, and of the certificate of renewal; and the fact that the insurance company, by the very terms of the certificate of renewal, required payment therefor, and that such certificate should be countersigned by the resident agent before it should become operative, shows that the company regard the renewal as a new contract, made at their option, and dependent in some degree upon the judgment and knowledge of such agent. Thus, if the agent should find the property depreciated in value, or the risk increased from any cause, he could refuse to countersign the renewal receipt, and the promise by the company to renew the policy would be thereby terminated. Now, it is very clear that all such contracts must be mutual, and that where a right is reserved to a party to renew or dissolve an obligation, the determination of such party to renew an expired contract, if accepted by the other, makes an original contract.

This contract of insurance is one of indemnity against loss by fire; and the whole loss of which the fire is the *actual* cause, is within its terms to the extent of the indemnity promised. Much is said by Judges of the proximate and remote cause of the loss; and the distinction was very elaborately discussed by counsel in the present case. But, after careful consideration, I must confess that, to my mind, the word "*proximate*" is unfortunately used, and serves often to mislead the inquirer, and to produce misapprehension of the real rule of law. That which is the *actual* cause of the loss, whether operating directly, or by putting intervening agencies—the operation of which could not be reasonably avoided—in motion, by which the loss is produced, is the cause to which such loss should be attributed. If, in the effort to extinguish fire, property is damaged or destroyed by water, the water may be said to be the *proximate* cause of the injury or destruction; yet in no just sense can it be said to be the *actual* cause. *That* was the fire. The fair and reasonable interpretation of a policy of insurance against loss by fire, will include within the obligation of the insurer, every loss which necessarily follows from the occurrence of the fire, to the amount of the actual injury to the subject of the risk, whenever that injury arises directly and immediately from the peril, or necessarily from incidental and surrounding circumstances the operation and influence of which could not be avoided.

Under this rule, what was the plaintiff's loss in the present case? The property insured was situated within the fire limits of Detroit, within which the reconstruction or repair of any wood building injured by fire was prohibited, unless by leave of the Common Council. The charter and ordinances of the city upon this subject, and the refusal of the Common Council to permit the repair of the building injured, were offered in evidence to show the extent of the plaintiff's loss, and rejected. This charter and these ordinances were in existence at the time of the

last renewal of the policy. They were local laws affecting the property, and the risk which the defendant assumed, and of which the latter is presumed to have had knowledge, and to have estimated in renewing the policy. Whether, therefore, in case of damage or partial loss, the Common Council would permit a repair of the building, was a risk which the company took upon itself, because the loss and injury to the plaintiff might depend in amount upon such action of the Council, while such loss and injury would be absolutely and actually the consequence of the fire; and because by the terms of the policy the company reserved the right to repair or not at option, thus taking the risk of the power to repair, and of all loss which should accrue if repairing should be impossible from any cause. To hold that for an injury to the property, which results, without the fault of the insured, in a total loss to him, so far as value and use are concerned, the insured can only receive compensation to the extent of the appraised damage to the materials of which the building was constructed, and which were destroyed, would establish a narrow, illiberal and illogical rule. The value of the building consisted in its adaptation to use, as well as in the materials of which it consisted; and if it could not be restored to use after the fire, the loss was total, less the value of the materials rescued. In the very pertinent language of the plaintiff's counsel, "The contract was not simply an agreement to pay for so much material as might be damaged by fire—to pay such amount as the material might actually be worth. Fixed by the conditions of the policy as the most hazardous of all structures, and with a premium adjusted accordingly, the insurer took the risk upon a 'three-story wood warehouse,' actually in use as such. The risk was not taken upon a mere collection of beams, boards and other materials, thrown together without purpose or special adaptation. It was upon a building for trade, situated within a particular locality, within the

jurisdiction of municipal authorities vested with legislative powers for special purposes, and subject to the exercise of those powers;" and the parties must be regarded as contracting with a full knowledge of all the facts and the law, and the risk to which the property was thereby subjected.

Of the power of the Common Council to pass the ordinances in question, we have no doubt. They contravene no provision of the Constitution as we read it, and they were made in the exercise of a police power necessary to the safety of the city. A regulation of the use of property, or a prohibition of its repair when partially destroyed, cannot, to my mind, be regarded as a condemnation to public use.

The Court erred in excluding the testimony offered, and in the rule of damages given to the jury.

The judgment is reversed, and a new trial ordered.

MANNING and CHRISTIANCY JJ. concurred.

CAMPBELL J.:

As I do not concur in all the views expressed by the Chief Justice, and have arrived at a different conclusion upon the validity of the action of the Circuit Court, I proceed to state the reasons upon which I have formed my opinion.

I concur in holding that if the by-law of the city of Detroit is valid and applicable, the plaintiff should recover on the basis of the claim which he sets up. If that by-law governs the case he had no right to repair his building without the leave of the Common Council, which has been refused; and the matter stands so far as he is concerned on the same footing as if he had been forbidden to repair by an ordinance leaving no room for such permission.

It was claimed on the argument, that where the inability

to repair arises from a by-law, such loss, so far as it is thereby enhanced, is caused by the by-law and not by the fire. Some cases were cited which may possibly favor such a construction. In the case of *Devaux v. Salvador*, 4 *A. & E.* 420, where an insured vessel, in an accidental collision, was injured less than the vessel which she struck, and was obliged by a decree in admiralty to contribute enough to equalize the injuries, it was held by the Queen's Bench that the loss by reason of this contribution was not a necessary or proximate consequence of the collision, and was due simply to the provisions of law. The American cases cited to the same point hardly go so far as this, and are distinguishable on the facts. I do not propose to refer to the somewhat inconsistent authorities. If by the very fact of the collision all these consequences became fixed, I am unable to perceive upon what ground it can be claimed, that the collision was not the responsible cause of all of them. If they were occasioned by subsequent events they might be too remote and contingent. But if determined absolutely by the collision itself, they must, as it appears to me, stand on the same footing with the other damages, unless, what is possibly the real difficulty in that case, the liability was not supposed to exist except for specific injuries to the body of the ship.

The rule applicable to such cases as the present is very well stated in *Irving v. Manning*, the decision of which by the Common Pleas is reported in 1 *C. B.* 168, and affirmed by the House of Lords in 6 *C. B.* 391. In that case a ship had been injured but not destroyed, and it was shown she might be repaired and put in as good order as before, but that when so repaired she would be worth less than the cost of the repairs. She was insured for a much larger sum; and the question was, whether the insured could abandon as for a total loss, and recover the full amount, or whether it must be regarded as a partial loss, for which the recovery must be limited to the smaller

sum. The case was held to be one of total loss. The opinion of the judges, delivered before the House of Lords, places the subject in a very clear light. They remark, "a vessel is totally lost, within the meaning of a policy, when it becomes of no use or value, as a ship, to the owner, and is as much so as if the vessel had gone to the bottom of the sea, or had been broken to pieces, and the whole or great part of the fragments had reached the shore as wreck: and the course has been in all cases in modern times to consider the loss as total, *where a prudent owner, uninsured, would not have repaired:*" p. 419.

This rule seems to me very simple, and entirely fair. It is the only rule which can give to the insured the indemnity he bargains for. If for any reason except a personal one the repairing of the property would not be undertaken by a prudent owner, who was not insured, it would not be reasonable to admeasure damages upon another basis practically false. If repairs are absolutely impossible, the remnants are worth nothing except as lumber. It can in my judgment make no difference why the repairing can not be done, if an insuperable obstacle exists. Any one such obstacle affects the owner as severely as any other obstacle. Submission to the law is as incumbent as submission to any other necessity, and must be regarded as equally unavoidable.

I am also of opinion, with the Chief Justice, that the renewal of the policy in controversy was in law a new insurance, and subject to all legal regulations in force at the date of such renewal.

The by-law in question, having been previously enacted, must, if valid, govern the case. I do not, however regard it as valid.

It appears distinctly that the warehouse insured had been erected for several years before the city charter was amended so as to authorize any interference with repairs to wooden buildings, and before the by-law in question was adopted. It also appears that the value of the injured

building, for purposes of repair, was more than half of its value before the burning, and amounted to from $2000 to $3000; while, if not allowed to be repaired, the materials were of very trifling value. The effect of this by-law is to deprive plaintiff of property, in the shape of what is precisely equivalent to an unfinished house worth more than two thousand dollars.

It is claimed that this by-law, and the provisions of the city charter under which it was adopted, must be regarded as legitimate police regulations, whereby persons are only restrained from applying their property to injurious uses, and that the use of property may be regulated without infringing upon the enjoyment of it for other purposes. It is also claimed that the language of the present charter is only an expression of what was implied in the former one. It does not appear whether the building in question was erected before or since the first laws which gave to the city the power to regulate wooden buildings; and if there has been no real change in these laws, there is force in the objection.

The present charter allows the city to prevent the "*location or construction*" of wooden buildings, the "*removing*" of such buildings, and the "*rebuilding or repairing*" of the same, within the fire limits which may be adopted. See *Charter of Detroit, Chap.* 4 *sec.* 22, *sub.* 35; *Laws of* 1857, *p.* 102.

The former charter gave the city power to prohibit any person or persons to "*erect or cause to be erected*" any wooden buildings, "within such parts, streets or districts of said city as the public safety may require." *Act of Feb.* 22, 1848, *sec.* 14; *Rev. Charter of* 1855, *p.* 29.

There is no foundation for any claim that these provisions are identical. The erection of a building brings into existence a building which had no existence before; and, if wooden buildings are perilous, creates a peril which never

before existed. The repairing of a building neither changes its indentity nor increases the peril from what it was before the injury. And, so far as this peril is concerned, it is hardly imaginable that a repaired building can ever be so dangerous as a dilapidated one. But be this as it may, repairing is in no sense the same as "erecting," and could not be so construed under the most liberal rules of interpretation.

But these regulations are regarded by the courts as invasions of private privileges, of a character analogous to that of penal laws; and their terms are strictly confined to their literal import. See *Stewart v. Commonwealth*, 10 *Watts*, 307.

Thus the removal of a building and placing it with proper supports and repairs upon another lot has been held an *erection:—Brown v. Hunn*, 27 *Conn*. 332. Erecting an addition to a wooden building, and then putting up a chimney in the old part for the use of the addition, is held not to be the erection of "an addition having in it a chimney or fireplace:" — *Daggett v. State*, 4 *Conn*. 60. So entirely remodelling a meeting-house or shop and converting it into a dwelling, is held not to be erecting a dwelling: — *Booth v. State*, 4 *Conn*. 65; *Tuttle v. State*, 4 *Conn*. 68. So, a building of wood partially filled in with brick, was held not within a regulation forbidding certain erections of wood: — *Stewart v. Commonwealth*, 10 *Watts*, 307.

This amended provision prevents the owner of a house which has been in the smallest degree damaged, by fire or otherwise, from repairing the building. If unroofed, as in the present case, by fire or by wind, and thus rendered untenantable until refitted, although it stands as a valuable erection, built before the law, and entirely capable of completion, this law by prohibiting its repair reduces it to all intents and purposes to a mere pile of materials.

The effect of such a provision is to destroy the building

for any use whatever, as effectually as if torn down. It is in no sense a regulation of the use of property. So far as the land alone is concerned, it may perhaps be regarded as such a regulation. But the building is quite as much property as the land. Were the city to tear down a house, it could not be said there was no property destroyed. If it were instead of violently destroying it to prohibit any one from inhabiting a house at all for any purpose, it is absurd to suppose no right of property is violated. That property of which our Constitution, following Magna Charta, declares no one shall be deprived without due process of law, does not mean the naked title, but signifies, as Blackstone well remarks, " the free use, enjoyment, and disposal" of it: 1 *Bl. Com.* 138. Where a highway is laid out over land, it does not in general divest the estate, but no one ever imagined it was not a deprivation of property. The deprivation of the use, is the deprivation of the only value which property has; and is not within the power of the Legislature, unless the property is wanted . for public use, or unless taken under due process of law. While, if public policy requires it, future erections may be regulated within fair and honest limits, those already in existence can neither be actually nor constructively destroyed, without violating the rights of private property. As already suggested the law in question does not regulate the use of an injured building, but utterly destroys its use. This question was somewhat discussed in *Welch v. Stowell*, 2 *Doug. Mich.* 332, where the Court animadvert very strongly against the legality of destroying property which was injurious merely from its improper use. The case of the *Commonwealth v. Alger*, 7 *Cush.* 53, which was the strongest case cited on the argument in favor of the power of regulating property by confining it in its uses, expressly declares it illegal to interfere with existing structures. In *Tonawanda Railroad v. Munger*, 5 *Denio*, 255, and in *Williams v. Michigan Central Railroad Company*, 2 *Mich.* 259, the use of property

was so far regarded as property itself, that it was said to be incompetent for the Legislature to authorize cattle to. run at large on highways, because the owner of the land was entitled to the pasturage and all other rights, subject only to the public easement. See also *Wynehamer v. People*, 13 *N. Y.* 378; *Brigham v. Edmands*, 7 *Gray*, 359; *Stephens v. State*, 2 *Pike*, 291. I can imagine no principle or semblance of a principle which can justify the entire prevention of the use of any property, under the pretext of regulating its use. And the law now in question appears to me to attempt nothing less than this usurpation of power. It is a prohibition and not a regulation. See *Austin v. Murray*, 16 *Pick.* 121.

The power of regulating the use of property is not maintainable as an arbitrary one. It has never been held that the Legislature had an unlimited discretion in this respect. It must be exercised for some purpose of public safety. And, where the facts do not create the danger, a legislative declaration to the contrary can not avail. Thus in *Walker v. Board of Public Works*, 16 *Ohio*, 540, it was held that a law directing a dam to be abated as a nuisance, which was not in fact a nuisance, was invalid. It would be somewhat difficult, in most cases, to show an increase of fire risks from mere repairs to an injured building. Certainly there can be no such universal danger.

I am of opinion, for the reasons I have been compelled to give somewhat hastily, that the city of Detroit has no power to prohibit repairs on the building in question.

I am also of opinion that the by-law is not warranted by the law itself. No by-law is valid which is not reasonable. And I think no by-law is reasonable which does not lay down some rule which will enable persons affected by it to know their rights and liabilities. This by-law does not lay down any rule, of proportion or otherwise, by which any one can determine what amount of injury, or what other circumstances, will preclude repairs. It

absolutely prohibits any repairs whatsoever, so far as the mandate goes, but, by qualifying the prohibition by the words "unless he shall have previously obtained permission of the Common Council," it is left entirely uncertain. I do not doubt that we should presume that body will act fairly, but it seems to me that the law does not contemplate any such flexible and uncertain rules:—*Austin v. Murray,* 16 *Pick.* 121.

I think there was no error in excluding the by-law from the case, and that the judgment should be affirmed.

*Judgment reversed, and new trial ordered.*